[No. G015750. Fourth Dist., Div. Three. Dec. 8, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK ANTHONY PLANAVSKY, Defendant and Appellant.

**COUNSEL**

John S. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Niki Cox Shaffer, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SILLS, P. J.—

## I. Introduction

Back in the early Sixties the Legislature enacted section 3051 of the Welfare and Institutions Code. Under the statute, "if it appears" to a sentencing judge that the defendant is a narcotics addict, or in danger of becoming one, the judge must stop everything and hold a hearing on the possibility of civil commitment to the California Rehabilitation Center (CRC).

What happens, however, when a possibly addicted criminal defendant makes no request for civil commitment and there is no record made of any consideration of the idea by the trial judge? Must the conviction be reversed because it was error for the trial judge not to have raised the issue on his or her own? The currently predominant solution to that question is based on a legal fiction. The fiction is that the sentencing judge is *presumed* to have considered civil commitment even if the record is totally devoid of any indication to that effect.

We agree with that result, but do not resort to a fiction to reach it. We follow the more "practical and straightforward" approach toward waiver recently enunciated by the California Supreme Court in *People* v. *Scott* (1994) 9 Cal.4th 331, 353 [36 Cal.Rptr.2d 627, 885 P.2d 1040]. Defects in sentences should be brought to the trial judge's attention in time to correct them, not remedied during a lengthy appellate process. (See also *People* v. *Welch* (1993) 5 Cal.4th 228, 235 [19 Cal.Rptr.2d 520, 851 P.2d 802] [traditional objection and waiver principles applied to preclude challenge to reasonableness of probation condition made for first time on appeal].) Further, while we acknowledge that a few appellate cases have *read into* Welfare and Institution Code section 3051 a right to raise CRC commitment for the first time on appeal, those cases were based on an overexpansive reading of applicable precedent.[1]

## II. Facts

In April 1992 Mark Anthony Planavsky stole a videocassette recorder from an apartment, pled guilty to burglary and was placed on three years'

---

[1]Unless otherwise specifically designated, all statutory references are to the Welfare and Institutions Code.

formal probation with imposition of sentence suspended.[2] Probation terms included regular drug testing and an absolute prohibition on ingestion of narcotics or illegal drugs.

In October of the same year, however, Costa Mesa police officers found Planavsky with a hypodermic syringe in his right hand; he was also under the influence of a controlled substance. At a hearing in November, Planavsky's probation was revoked, but then reinstated, with these additional conditions: he was to receive a state prison sentence of four years, but execution of that sentence was to be suspended; he was to serve one hundred eighty days in county jail, but be allowed to enroll in a residential drug treatment program; any time spent in that program was to be credited toward his county jail time. Thus, essentially, his probation violation meant time in a residential drug treatment program.[3] Planavsky enrolled in the Unity House program in Westminster, but did not stay long, "absconding" from the program in early January 1993. Nevertheless, no probation revocation proceedings were then instituted.

In late October 1993 Planavsky tested positive for amphetamine use; in November 1993 he failed to report to his probation officer or submit to drug testing. These latest developments did prompt the institution of probation revocation proceedings.

A probation revocation hearing was held in February 1994, and a sentencing hearing followed in late March. At the sentencing hearing Planavsky's counsel requested yet continued *probation*, in which Planavsky would be ordered to serve a year in a Costa Mesa-based narcotics rehabilitation program known as the "Rap Institute." The presentence report from the probation department spoke highly of the Rap Institute, which it described as offering a "highly structured, effective program which requires complete honesty and effort from its participants." However, because Planavsky had violated the terms of his probation three times already,[4] and in particular had failed to cooperate with the Unity House program, the probation officer writing the report felt "constrained" against recommending further probation. The bottom line of the report was that probation be *denied*.

[2]Planavsky pled guilty to one count of violating Penal Code section 459 in the first degree, which at the time (and still does) carried a penalty of two, four or six years in state prison. (Pen. Code, § 461.) However, the guilty plea form mistakenly listed the sentence range as two, four or *five* years.

[3]While we do not have a record of this particular revocation hearing, it is apparent from the remarks of the judge at the subsequent revocation hearing which is the subject of this appeal that Planavsky was sentenced to four years, with execution of the sentence suspended.

[4]A section of the report entitled "Adjustment on Probation" recounted *two* instances when Planavsky had violated his probation: (1) the time in October 1992 when Planavsky was found to have a hypodermic syringe and be under the influence of a controlled substance, and (2) his January 1993 absconding from the Unity House program. We infer that the third time

The probation report was also rife with references to Planavsky's problem with illegal drugs. Cocaine was listed as one of his "habits." Planavsky told a probation officer that his probation violations were caused by his continued drug use. His original crime was done to sell the videocassette recorder for "food or drugs." He described that crime as a " 'save me type thing.' " However, in the interim Planavsky had just "dug himself deeper into the hole" because of continued drug use. Planavsky claimed to have left the Unity House program because "too many other participants were using drugs."

The sentencing judge was clearly familiar with the probation report. In colloquy with Planavsky's counsel he revealed he knew the page of the report mentioning the Rap Institute; he also knew the report formally recommended denial of any probation. Further, the judge consented to listen to a representative of the Rap Institute, who indicated that the program had "good success" with "meth substance abusers." At the end of the hearing the judge noted Planavsky's "numerous violations" of probation, and stated if those violations did not exist, he would "be probably fairly willing to try the Rap program."

However, the previous judge had determined that Planavsky's "next violation" would be "state prison." Even though the sentencing judge thought the Rap program "very helpful," he decided to "follow the last judge" (presumably the one who presided over the November 1992 revocation hearing). Planavsky's probation was revoked, with Planavsky to serve the four-year sentence the execution of which had been previously suspended; he was, of course, to receive credit for time already served.[5]

Section 3051 provides that "if it appears to the judge" that a defendant "may be addicted" to narcotics, the judge "shall suspend the execution of the sentence" and order the district attorney to file a petition for "commitment of the defendant to the Director of Corrections for confinement in the narcotic detention, treatment and rehabilitation facility unless, in the opinion of the judge" there is a "pattern of criminality" rendering the defendant unfit "for

---

was the October 1993 positive drug test together with the November 1993 failures to report and be tested.

[5]The judge stated the credits in the probation and sentencing report were not correct. Planavsky's counsel said total credits were 912 days, which the trial judge said was probably "close to correct," but the figure was challenged by the deputy district attorney. The hearing ended with the trial judge stating "you have to spend some time trying to refigure the credits. I'm not sure what the credits are. Probation revoked and terminated. Anyway, that's the sentence." Because we reach the basic legal question presented by the appeal—was Planavsky required to specifically request CRC commitment?—it is immaterial what the precise amount of credits were and whether Planavsky may have been released prior to the filing of this opinion.

commitment."[6] No one mentioned section 3051 at the sentencing hearing and Planavsky made no request for placement in the CRC, or anywhere other than the Rap Institute.

On appeal Planavsky now argues that since the record shows he may well be addicted to cocaine or methamphetamine, the trial court should have suspended proceedings to review whether he should be confined in "a" narcotics rehabilitation facility.[7] The Attorney General responds that since Planavsky did not request proceedings under section 3051, the absence of a sua sponte initiation of such proceedings was not error.[8]

## III. A CRIMINAL DEFENDANT MUST REQUEST PLACEMENT IN THE CRC TO PRESERVE THE ISSUE FOR APPEAL

### A. *Present State of the Case Law*

Section 3051 had its genesis in the Governor's 1961 Special Study Commission on Narcotics. The commission produced a comprehensive set of procedures for, among other things, the establishment of the CRC under the jurisdiction of the Department of Corrections and the civil commitment,

---

[6]Here is the complete text of the first paragraph:

"Upon conviction of a defendant for any crime in any superior court, or following revocation of probation previously granted, and upon imposition of sentence, if it appears to the judge that the defendant may be addicted or by reason of repeated use of narcotics may be in imminent danger of becoming addicted to narcotics the judge shall suspend the execution of the sentence and order the district attorney to file a petition for commitment of the defendant to the Director of Corrections for confinement in the narcotic detention, treatment, and rehabilitation facility unless, in the opinion of the judge, the defendant's record and probation report indicate such a pattern of criminality that he or she does not constitute a fit subject for commitment under this section."

[7]Planavsky tries to imply that the Rap Institute is "the" narcotics rehabilitation facility mentioned in section 3051, but nothing in the record supports the idea. (See § 3153 [providing for "halfway houses" under the authority of the Director of Corrections].)

[8]Even though Planavsky may have completed his sentence, we still reach the question of whether a defendant must specifically request CRC commitment.

First, this case is not moot. Under section 3000, subdivision (b)(1) of the Penal Code, at the expiration of a term of imprisonment imposed under section 1170 (which Planavsky here was, because he received a determinate term), an inmate is to be "released on parole for a period not exceeding three years." If, during those three years, Planavsky were to violate the terms of his parole, he would again face time in prison and today's decision could affect the length and term of that imprisonment.

Second, even if this case were moot, the question presented is one capable of repetition yet evading review. Defendants who might be considered the best candidates for CRC commitment are generally the ones most likely to have served their terms prior to final disposition on appeal. A defendant who, for example, committed a first degree burglary motivated by the need to obtain money to feed a narcotics addiction, might receive a sentence as short as two years (Pen. Code, § 461), which, depending on worktime credits (Pen. Code, § 2933.5), could easily mean the defendant would be out in less than one year.

release and discharge of narcotic addicts. (See *People* v. *Navarro* (1972) 7 Cal.3d 248, 261 [102 Cal.Rptr. 137, 497 P.2d 481].) The statute expressed a "strong legislative policy" favoring the commitment and treatment, rather than punishment, of narcotics offenders. (*Id.* at p. 262.) The policy reflected the "current medico-social approach"—current at least for the early 1960's—of stressing rehabilitation over punishment. (See *People* v. *Ortiz* (1964) 61 Cal.2d 249, 255 [37 Cal.Rptr. 891, 391 P.2d 163].) As such, the "strong legislative policy disclosed" by the statute favored "inquiry into the addictive status of *all* criminal defendants whose record indicates the presence of an addiction problem." (*Ibid.*)

The statute resulted in a series of reversals in early cases where trial judges formed mistaken notions defendants were not eligible for civil commitment. (See *People* v. *Wallace* (1963) 59 Cal.2d 548, 552-553 [30 Cal.Rptr. 449, 381 P.2d 185] [sympathetic trial judge erroneously believed that prior misdemeanor conviction precluded civil commitment under predecessor statute of 3051]; *People* v. *Ortiz, supra,* 61 Cal.2d at pp. 252-255 [sympathetic trial judge erroneously believed that nature of offense precluded commitment]; *People* v. *Pineda* (1965) 238 Cal.App.2d 466, 470-473 [47 Cal.Rptr. 879] [trial judge erroneously believed that two prior convictions precluded commitment].)

It was not until about 15 years after enactment, in *People* v. *Flower* (1976) 62 Cal.App.3d 904 [133 Cal.Rptr. 455], that an appellate court faced the "precise question" of whether reversal was required when the record was *silent,* that is, when the possibility of civil commitment had not been brought to the attention of the trial judge. (See *id.* at p. 910.)

In *Flower,* the record clearly revealed the possibility of defendant's narcotics addiction. The defendant admitted being a heroin user off and on for eight years. (62 Cal.App.3d at p. 909.) However, despite testimony from the defendant that he "had a measure of success with the CRC program," the record was "devoid" of any reference to section 3051. (62 Cal.App.3d at pp. 909-910.)

The *Flower* court avoided reversal by reasoning this way: The record raised the possibility the defendant might have been addicted. Therefore the trial court "was required" to consider the applicability of section 3051. (*People* v. *Flower, supra,* 62 Cal.App.3d at pp. 909-910, citing *People* v. *Ortiz, supra,* 61 Cal.2d at pp. 254-255.) Next, the law presumes "official duty has been regularly performed." (*Flower, supra,* 62 Cal.App.3d at p. 910, quoting Evid. Code, § 664.) The effect of the presumption is to impose on defendants the burden of proving a negative, namely, that the trial court

did *not* "consider making such a referral" under section 3051. Finally, where the record is silent, that burden is clearly not sustained. (*Flower, supra*, 62 Cal.App.3d at p. 910.)

*Flower* thus rested on a self-contained legal fiction. If a trial court is required to have done something, it is presumed to have done it, and the absence of any indication that it did not do it is not enough to refute the presumption.

More than a decade later, *People* v. *Sanford* (1988) 204 Cal.App.3d 1181 [251 Cal.Rptr. 707] attempted to limit *Flower* by drawing a distinction between a formal "finding" by the trial court that a defendant was addicted (or in danger of becoming addicted) and an absence of one. If the court made such a finding, then the court was obligated to make a record of its consideration of civil commitment; if not, then no obligation was imposed. (See *Sanford, supra*, 204 Cal.App.3d at pp. 1183-1184.) Because the trial court had made such a finding in *Sanford*, the silent record meant reversal, rather than, as in *Flower*, affirmance.

*Sanford*, interestingly enough, had its genesis in a "*Wende* brief," that is, the appellate court *itself* raised the issue after the defendant's appointed counsel had submitted an appellate brief indicating there were no issues to raise on appeal. (*People* v. *Sanford, supra*, 204 Cal.App.3d at p. 1183, fn. 1.) In such a context, it was natural that the *Sanford* court began its discussion by stating that while the defendant did not raise the issue at trial, it could be raised for the first time on appeal. (*Id.* at p. 1183.) For this proposition the court cited, without explanation, *People* v. *Pineda, supra*, 238 Cal.App.2d at page 473. The court noted that the sentencing court had found the defendant was an addict or in danger of becoming one, and from that drew the conclusion that the trial court was "required" to initiate proceedings to determine the advisability of civil commitment. (*Sanford, supra*, 204 Cal.App.3d at p. 1183.[9]) The court then contrasted *Pineda*, a reversal, with *Flower*, an affirmance, and noted that in both cases there was "no record" of

---

[9]The court cited three cases, without elaboration, for this step in its reasoning.

First was *People* v. *Navarro, supra*, 7 Cal.3d at page 263. Presumably the *Sanford* court was referring to this language: "By section 3051 (and § 3050) the judge *is required in all instances* whenever it appears to him that the defendant may be addicted or in imminent danger of becoming addicted, to adjourn the proceedings or suspend the imposition of sentence. . . . If found to be a narcotic addict or in imminent danger thereof the judge [to quote from section 3051] '*shall make* an order committing such person to the custody of the Director of Corrections for confinement in the facility until such time as he is discharged . . . .' "

The second case was *People* v. *Perez* (1987) 196 Cal.App.3d 686, 691 [242 Cal.Rptr. 135]. In *Perez*, like *Navarro*, the defendant specifically requested civil commitment; the *Sanford* court was presumably citing either the comment by the *Perez* court at page 691 that "once it appears that defendant may be an addict or in imminent danger of becoming one, the only

consideration of civil commitment. (See *Sanford, supra,* 204 Cal.App.3d at p. 1183.) In the next paragraph the *Sanford* court tried to resolve the tension by quickly agreeing with the Attorney General's suggestion that *Flower* be limited to cases "where the trial court has made no findings about the danger of addiction." The *Sanford* court did not say why. (See *Sanford, supra,* 204 Cal.App.3d at p. 1184.)

Having decided without explanation to limit *Flower* to cases where there was no formal finding of addiction, the *Sanford* court was ready to conclude the case. It could not "find that the [trial] court discharged its duty to initiate these proceedings when the court found the defendant to be addicted." (*People* v. *Sanford, supra,* 204 Cal.App.3d at p. 1184.[10]) The matter had to be returned for "consideration of whether commitment proceedings should be initiated." (*Ibid.*)

---

valid statutory ground not to initiate commitment proceedings is defendant's pattern of criminality" or its quotation of the "all instances" language that originated in *Navarro.* (See *Perez, supra,* 196 Cal.App.3d at p. 691, quoting *People* v. *Lopez* (1978) 81 Cal.App.3d 103, 110 [146 Cal.Rptr. 165], quoting *People* v. *Navarro, supra,* 7 Cal.3d at p. 263.)

The third case cited by *Sanford* was *People* v. *Lopez, supra,* 81 Cal.App.3d at page 110, which, like the two other cases, involved a specific request by the defendant to the trial court for civil commitment under section 3051. Presumably the *Sanford* court was referring to the *Lopez* court's quotation of the "all instances" language from *Navarro. Lopez* reasoned that because reports of two psychiatrists were in the trial court's file showing the defendant was "in fact addicted," the trial court had "no alternative but to proceed with a civil commitment unless it appeared that defendant was not a fit subject." (*Lopez, supra,* 81 Cal.App.3d at pp. 110-111.)

[10]For this step in its logic the *Sanford* court cited *People* v. *Pineda, supra,* 238 Cal.App.3d at page 473 and *People* v. *Bracamonte* (1982) 137 Cal.App.3d 936, 940 [187 Cal.Rptr. 525]. As we explain in greater detail below, the general tenor of the *Pineda* court's discussion on page 473 was not directed at the fact of a "silent record" but at an extremely harsh (and, to the *Pineda* court's mind, clearly disproportional [see *Pineda, supra,* 238 Cal.App.2d at p. 471]) penalty. In light of that penalty, the *Pineda* court thought the trial judge should have the "opportunity, as well as the responsibility" of sentencing the defendant without being under the misapprehension that the defendant was *ineligible* for civil commitment.

*Bracamonte* was not a civil commitment case at all. It involved possible commitment to the California Youth Authority (CYA). It is difficult to figure out what, on page 940 of the opinion, lends support to the *Sanford* court's conclusion that the trial judge had a duty to initiate proceedings in the wake of a finding of addiction. The main issue in *Bracamonte* was whether CYA commitment was a "sentencing choice" requiring the trial court to state reasons on the record for rejecting it as an option. (See *People* v. *Bracamonte, supra,* 137 Cal.App.3d at p. 938.) The court then took about three pages to explain that CYA commitment is not a sentencing choice (so no reasons for rejection were required on the record), in the process of which it pointed out that there is no statutory requirement for a finding on the record that a defendant can benefit from CYA commitment. The closest support that appears on page 940 for the *Sanford* court's statement is the observation that "[a]s long as the record reflects that the judge considered a CYA commitment, his statement of reasons for imposing a prison term will suffice for the purpose of appellate review of the CYA rejection." (*Bracamonte, supra,* 137 Cal.App.3d at p. 940.)

*People* v. *Brandon* (1989) 206 Cal.App.3d 1565 [254 Cal.Rptr. 504] followed close on the heels of *Sanford*—the two opinions were separated by about four months. The *Brandon* court either deliberately ignored or was not aware of *Sanford*. *Brandon* involved a specific request for probationary placement in "a special drug treatment program," but no request for CRC commitment. (See *Brandon, supra,* 206 Cal.App.3d at p. 1569.)

*Brandon* cited *Flower* for the proposition that in the absence of a request for CRC commitment, it could be presumed that the trial court "properly exercised its discretion to conclude defendant was not eligible." (*People* v. *Brandon, supra,* 206 Cal.App.3d at p. 1569.) The court then described the Attorney General's argument that the defendant's extensive criminal record would "preclude commitment even if defendant were addicted to narcotics," so "a fortiori the trial court would need to make no further inquiry into the status of defendant's possible addiction." (*Ibid.*) The *Brandon* court must have liked this argument, because it next described the defendant's counter-argument—that his pattern of criminality did not necessarily bar CRC commitment because the defendant was convicted in municipal court, not superior court—and then refuted it for two pages, while it left the Attorney General's argument untouched.[11] The final paragraph of the opinion ended by reasoning that since the record showed a clear pattern of criminality, no "abuse of discretion" had been shown in the trial court's "refusal" to initiate proceedings to determine the appropriateness of civil commitment. (*Id.* at p. 1571.) While never stated in so many words in the opinion, the use of the word "refusal" suggests the *Brandon* court must have agreed with the *Flower* fiction that, given a silent record, a trial court must be *presumed* to have mentally considered civil commitment under section 3051 and rejected it.

Most recently, *People* v. *Young* (1991) 228 Cal.App.3d 171 [278 Cal.Rptr. 784] faced the problem of a trial court's supposed "failure" to consider civil commitment when a defendant fails to request it. In *Young* the defendant made no request for civil commitment under section 3051, but then claimed on appeal that it was error not to consider him for it anyway.

*Young* uncritically cited *Sanford* for the idea that the issue could be raised for the first time on appeal (*People* v. *Young, supra,* 228 Cal.App.3d at p. 182), but still affirmed because the particular record in the case was just not strong enough to put the trial court "on notice" that the defendant was, or

---

[11]Essentially, the defendant argued he was really convicted in municipal court. The court rejected the contention, pointing out his guilty plea had been taken by a municipal court judge acting as a magistrate. The court went on to say that in any event it makes no sense to distinguish between the location of guilty pleas for purposes of finding a pattern of criminality under section 3051. (See *People* v. *Brandon, supra,* 206 Cal.App.3d at pp. 1570-1571.)

was in imminent danger of becoming, an addict. (See *id.* at pp. 182-185 and particularly p. 185 ["this record was not sufficient to put the trial court on notice, as a matter of law . . . that appellant may be addicted . . . ."].) Consequently, by the very terms of the statute there was no need to consider civil commitment under section 3051.

But after that point was nailed down, the court added that even if the trial court was required to consider section 3051 commitment, the court would "adopt" the rationale of *Flower* and *Brandon* and presume that official duty had been regularly performed. (*People* v. *Young, supra*, 228 Cal.App.3d at p. 186.) It did not say why.

### B. *Why the Defendant Must Bring the Possibility of CRC Commitment to the Attention of the Trial Court*

As we have just seen, the current state of the case law bearing on the question of CRC commitment in the context of silent records can be harmonized merely on the basis of whether the trial judge made a formal finding of addiction or imminent danger of addiction. There was a formal finding in *Sanford*—therefore the trial judge was obligated to suspend proceedings. There were no findings in *Flower, Brandon* and *Young*— therefore the trial judge was under no such obligation. As a judicially created rule, of course, the distinction has the advantage of being simple, and we might readily resolve the present case on that basis. The distinction is not, however, particularly persuasive.

For one thing, the distinction owes its existence to a concession made by the Attorney General in *Sanford*, yet the basis of that concession, the reasons behind the Attorney General's "suggestion" that *Flower* be limited to cases involving no formal findings, and the appellate court's adoption of that suggestion, were never articulated. The distinction comes to us as a judicially created rule without judicially articulated reasons.

For another, the distinction is counterintuitive. As a practical matter, a trial judge who makes a finding on the record that a defendant is an addict is far more likely to have actually mulled over the question of civil commitment under section 3051 in his or her own mind and reached a decision that the defendant is not a fit candidate. At least *that* judge is aware of some of the dynamics of section 3051, and therefore in all probability may be more accurately "presumed" to have regularly performed any official duty to "consider" civil commitment under the statute.

By the same token, a judge who makes no finding on the topic of addiction is more likely to have simply forgotten altogether about the

possibility of civil commitment under section 3051. It is, after all, the judge who is *aware* of section 3051 who is more likely to express his or her consideration of the statute on the record, so as to avoid an unnecessary reversal.

Further, the distinction does not mesh with the actual text of section 3051. Addiction can "appear" to the sentencing judge without being the subject of a formal finding. As the *Ortiz* court noted about the predecessor of section 3051, the statute does not set forth "any formalities" which the sentencing court must follow in making its "preliminary determination" of addiction. (*People* v. *Ortiz, supra,* 61 Cal.2d at p. 254.) The presence of a formal finding of addiction should therefore not make any difference.

Accordingly, we do not resolve the instant case on the mere absence of a formal finding of addiction.

*Flower*'s approach, however, is similarly unconvincing. It may be brilliant metaphysics—deeming things that never actually happened to have been done because they were presumed to have been done when no one can prove otherwise[12]—but it does not meet the core problem created by section 3051. If section 3051 really does require sua sponte consideration of civil commitment by the trial judge, then merely waving a wand and deeming that consideration to have taken place in some other dimension than the trial court record does nothing to show the requirement was met. What should have been done probably did not happen. To paraphrase something Galileo said in an analogous context, "but the judge still didn't consider it."[13]

A much better approach is rooted in simple practical reality. "Routine defects in the court's statement of reasons [for a sentencing choice] are easily prevented and corrected if called to the court's attention." (*People* v. *Scott, supra,* 9 Cal.4th at p. 353.) It is wasteful—and, frankly, an incentive for gamesmanship—to allow easily correctable sentencing errors to be raised for the first time on appeal where an appellate court has "no choice" but to remand when there is prejudicial error. (See *id.* at p. 355.) It is an expensive, time-consuming process that could be easily avoided by simply calling something to the trial court's attention. "The point is that by encouraging counsel to intervene at the time sentencing choices are made, [the Supreme

---

[12]Cf. Carroll, Through the Looking Glass and What Alice Found There, at chapter VII, The Lion and the Unicorn: " 'I see nobody on the road,' said Alice. [¶] 'I only wish *I* had such eyes,' the King remarked in a fretful tone. 'To be able to see Nobody! And at that distance too! Why, it's as much as *I* can do to see real people, by this light!' " (Original italics.)

[13]The original quotation being, "But it does move," attributed to Galileo Galilei after his recantation concerning the earth's orbit around the sun. (See The Oxford Dict. of Quotations (4th ed. 1992) at p. 297.)

Court] hope[s] to reduce the number of issues raised in the reviewing court in *any* form." (*Id.* at p. 357, fn. 18.)[14]

Moreover, requiring the defendant to make a section 3051 request accords with the basic rules of appellate procedure. The classic formulation is that it is *"unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 311, p. 321.) That rationale certainly applies to the stratagem of keeping mum about the possibility of civil commitment and then, if one is sent to prison, raise it on appeal. The tactic essentially sandbags the sentencing court.

Typical exceptions to the rule against raising issues for the first time on appeal, such as lack of jurisdiction, the issue being solely one of law concerning undisputed facts, or involving an issue of public importance, do not apply in the case of civil commitment under section 3051. The questions of whether the defendant "appears" to be an addict or in danger of becoming one and, if so, whether the defendant's "pattern of criminality" renders him or her unfit for civil commitment are highly factual. So is the exception in the statute for a "pattern of criminality."

We would add that requiring the defendant to request consideration under section 3051 is only common sense anyway. If there is to be any possibility of successful treatment at the CRC, the defendant must want it deeply enough to ask for it. Drug treatment is completely ineffectual without the addict's actual desire to end the addiction.

There are two possible objections, however, to applying the practical approach of *Scott* to the instant case. First, what about the cases that just flat out say that CRC civil commitment can be raised for the first time on appeal? Second, what about retroactivity? Our Supreme Court expressly made the rules in both *Scott* and its progenitor, *Welch,* prospective only. (See *People* v. *Scott, supra,* 9 Cal.4th at pp. 357-358; *People* v. *Welch, supra,* 5 Cal.4th at pp. 237-238.)

---

[14]In her dissent in *Scott,* Justice Kennard expressed concern that requiring defendants to bring sentencing errors to the trial court's attention was not in accord "with the daily reality of felony sentencing in our trial courts." (*People* v. *Scott, supra,* 9 Cal.4th at p. 359 (dis. opn. of Kennard, J.).) In particular she contended that a waiver requirement would not allow a "meaningful opportunity to identify and object to any sentencing error." (*Id.* at p. 360.) Trial courts, however, retain authority to correct sentencing errors—in a manner favorable to the defendant—prior to execution of judgment (see *People* v. *Karaman* (1992) 4 Cal.4th 335 [14 Cal.Rptr.2d 801, 842 P.2d 100] [trial court retained jurisdiction to modify sentence prior to sentence]), so there is at least some window of opportunity for defense counsel to bring such errors to the trial court's attention even after the sentence has been entered in the court's minutes.

### 1. *Previous Readings of Section 3051*

We deal first with the expansive reading of section 3051 by some of the cases. Under the *Flower* rule, it indeed appeared that sentencing judges *did* have a sua sponte duty to consider civil commitment. While no Supreme Court case had formally said so, dicta in *People v. Navarro, supra,* 7 Cal.3d at page 263 (the "all instances" language quoted in footnote 5, *ante*) and *People v. Ortiz, supra,* 61 Cal.2d at pages 254-255 (to the effect that courts should implement, rather than frustrate, "strong legislative policy" favoring rehabilitation) certainly came very close. Later, *Sanford* and *Young* flatly declared that the issue of civil commitment under section 3051 could be raised for the first time on appeal.

We need not opine on the viability of the "strong legislative policy" favoring rehabilitation mentioned in *Ortiz.* Much, of course, has changed since the Sixties.[15] What is significant for our purposes is that there is no necessary relationship behind a policy in favor of rehabilitation and a mandate that a request for CRC commitment may be raised for the first time on appeal. Put another way, it does not follow that the policy behind section 3051 as enacted by the Legislature excuses the failure to request such commitment. In fact, as we have just indicated, common sense suggests exactly the opposite. Unless an addict is genuinely motivated to overcome his or her habit, CRC commitment will be futile.

Furthermore, the cases which *do* allow CRC commitment to be raised for the first time on appeal do not represent a well-entrenched position in terms of stare decisis. *Young* merely cited *Sanford*; *Sanford* merely cited *Pineda*; and *Pineda* does not quite stand for the idea.

*Pineda* never specifically dealt with the failure on the part of a defendant to request civil commitment. Rather, as noted by *People v. Peel* (1993) 17 Cal.App.4th 594, 599 [21 Cal.Rptr.2d 449], the court in *Pineda* focused on something else: whether the mistaken belief by the sentencing judge that the defendant had two prior felony convictions (when, in actuality, one of the prior convictions was sentenced as a misdemeanor) was *harmless.* As *Peel* says of *Pineda,* "Thus, since the defendant in *Pineda* did not claim the trial court erred in failing to consider civil commitment, the court did not necessarily decide the question for which it is cited in *Sanford.*" (*Peel, supra,* 17 Cal.App.4th at p. 599.)

The crime in *Pineda* was simple possession of heroin, for which the defendant was sentenced, given his prior convictions, to 15 years in prison.

---

[15]The predecessor to section 3051 was literally enacted, as poet Philip Larkin once said of something else, before the Beatles' first LP. Or before hippies, flower children and the Viet Nam war for that matter.

The *Pineda* court took pains to point out that this term exceeded what was then prescribed for first degree murder, robbery with a deadly weapon, first degree burglary, lewd acts with children or rape. (See *People v. Pineda*, *supra*, 238 Cal.App.2d at p. 471.) It was a sentence "so long" and "so absolute" that it amounted to a "Dantesque abandonment of hope." (*Id.* at p. 473.)

In addition to what the *Pineda* court considered the gross disproportionality of the defendant's sentence, two other factors were present: (1) the strong policy in favor of rehabilitation and (2) the lack of certainty about what the trial judge would have done if he had known the "exact information about the prior offenses." (*People v. Pineda, supra*, 238 Cal.App.2d at p. 473.) All three factors figured in the court's ultimate determination that the trial judge's mistaken belief was not harmless. The court summarized its decision in one critical sentence at the bottom of page 473: "Where, as here, the penalty for the crime is extremely harsh and the program of rehabilitation strongly supported by public policy, and we are not assured that the sentencing judge was enabled to evaluate properly the possibility of rehabilitation for this appellant, we deem it proper to remand the case for sentencing."

The first reason given by the *Pineda* court—disproportionality—is not persuasive here because there is nothing about disproportionality that should excuse the failure to object to a sentence at trial. In fact, common sense suggests it should be the other way around. If a defendant receives a grossly harsh sentence, that is all the more reason to bring the matter to the trial judge who can make a speedy and inexpensive correction of any error.

*Pineda*'s second reason was that rehabilitation by civil commitment was "strongly supported by public policy." As we have already seen, however, there is nothing about the policy behind section 3051 which excuses the failure to request civil commitment. If an addict is not motivated enough to request CRC commitment, he or she is hardly motivated enough for that commitment to work.

The final reason was uncertainty about what the trial judge might have done if he had known the "exact information about the prior offenses." By itself, this reason is not sufficient to justify ignoring the usual need to raise an issue for the first time at the trial level. Indeed, as we have already shown, the very nature of civil commitment *favors* the usual rule.

## 2. *Retroactivity*

We now turn to the retroactivity issue. As the court in *Scott* pointed out, prior to *Welch* appellate courts had *uniformly* stated or implied that challenges to the reasonableness of probation decisions could be raised at any

time. (*People* v. *Scott, supra,* 9 Cal.4th at p. 331.) The rule in *Welch* was to be applied prospectively only because counsel had been *relying* on the ability to raise such issues for the first time on appeal. (*People* v. *Welch, supra,* 5 Cal.4th at p. 238 ["defendant should not be penalized for failing to object where existing law overwhelmingly said no such objection was required"].) By the same token, the *Scott* court reasoned that because the "clear weight of authority had broadly held or assumed that errors in the court's sentencing choices and statement of reasons could not be waived," the "equitable and orderly administration of the law" likewise favored making that decision not applicable to sentencing hearings prior to its finality. (*People* v. *Scott, supra,* 9 Cal.4th at pp. 357-358.)

This case is different. As we have explained, prior to today's decision two cases (*Sanford* and *Young*) had said that the issue of CRC commitment could be raised for the first time on appeal. But, as we have also shown, the law was more complex than that. *Flower, Brandon* and even *Young* basically established a rule that a completely silent record showed no error as a matter of law. The critical feature was whether the trial court had made a formal finding of addiction.

Defendants and their counsel could hardly be said to have relied, as in *Welch* and *Scott,* on a well-established rule that the sentencing error complained of could be raised for the first time on appeal. In the context of 3051 CRC commitment, the most defendants could rely on was that where a *formal finding* of addiction had been made, the issue might be raised for the first time. No such formal finding, however, is present in this case, so Planasky's trial counsel did *not* have the same expectations about the lack of a need to raise the issue at trial as did counsel in *Welch* and *Scott.* Because the *result* in this case is totally consistent with the case law at the time of the sentencing hearing, it is not unfair to apply the waiver rule to Planasky. We have simply articulated a new rationale for the result mandated by existing case law.

## IV. CONCLUSION

Because Planavsky did not request civil commitment to the CRC at the trial level, he will not now be heard to claim that the trial judge's failure to state any such consideration on the record was prejudicial error. The judgment is affirmed.

Wallin, J., concurred.

**CROSBY, J.,** Concurring.—My reading of the record convinces me the superior court has been well aware of Planavsky's drug abuse problem since

at least April 7, 1992, when he pleaded guilty to one count of residential burglary. The *Tahl* form (*In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]) included defendant's initials in the box indicating he would be placed on probation, but a violation could result in the imposition of a maximum five-year term. Although several conditions of probation required his cooperation in drug treatment programs, the *Tahl* form box advising that California Rehabilitation Center (CRC) proceedings might be instituted was X'd out.

Planavsky was found to be in violation of his probation a mere seven months later, on November 12, 1992. Probation was revoked, a four-year prison sentence was imposed, execution was suspended, and probation was reinstated. A new condition of this probation required Planavsky to enroll in a residential drug treatment program, and "the balance of any Orange County [j]ail sentence [could] be served in that program."

When defendant violated probation again on March 25, 1994, more than a year after the prison sentence had been imposed, and the judge decided not to reinstate probation, he had no jurisdiction to do anything other than to order Planavsky to begin his previously ordered prison term. (*People* v. *Chagolla* (1984) 151 Cal.App.3d 1045, 1049 [199 Cal.Rptr. 181].) With 912 days of actual and conduct credits, defendant has by now completed the sentence; and the last thing he wants, presumably, is a ticket to CRC. The majority spins its wheels for naught; the appeal should be dismissed as moot.

Moreover, the majority concedes defendant cannot prevail under existing law.[1] And his criminality was far too excessive for a CRC commitment in any event.[2] The majority has opinion, needs case; but this is not the one. Publication of hyperbolic dicta is rarely useful to the bench and bar.

---

[1] The result suggested by the case law does fly directly in the face of section 3051 of the Welfare and Institutions Code, however. When the Legislature says "shall," I tend to think it means it.

[2] A sampling of Planavsky's sorry record includes giving false identification to a peace officer (1988), possession of a dangerous drug (1989), felony joyriding (1990), receiving stolen property (1990), possession of a hypodermic needle and giving false identification to a peace officer (1991), receiving stolen property (1991), first degree burglary (1992), joyriding (1992), numerous other arrests for serious offenses, and a fistful of probation violations as well.