[No. A122580. First Dist., Div. One. June 12, 2009.]

In re M.S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
M.S., Defendant and Appellant.

CᴏᴜɴsᴇL ·

Lisa M. Romo, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Jeffrey M. Bryant, Deputy Attorneys General, for Plaintiff and Respondent.

Oᴘɪɴɪᴏɴ

**MARGULIES, J.**—M.S. admitted two counts of a Welfare and Institutions Code[1] section 602 petition alleging violations of Penal Code section 245, subdivision (a)(1), and criminal street gang allegations pursuant to Penal Code section 186.22, subdivision (b)(1). After determining that the assaults were felonies, the court committed the minor to the Division of Juvenile Justice (DJJ), and set the maximum period of confinement at 10 years six months. The court also ordered gang registration pursuant to Penal Code section 186.30.

The minor contends the court violated the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.), by committing him to the DJJ instead of a less restrictive placement because the minor has diabetes. He further contends the court violated his due process rights by considering his diabetes as a factor in selecting the appropriate placement.

We hold the court did not abuse its discretion by committing the minor to the DJJ. The claimed ADA violation is not cognizable in the context of this appeal as grounds for reversal of an otherwise valid dispositional order. We also hold the dispositional order did not violate due process, and affirm the order.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

# I. FACTS

## A. *The Current Petition*[2]

On June 19, 2008, a group of 20 to 25 males and females playing hide-and-seek at an elementary school were approached by a group of males in a car asking if they "needed something." The hide-and-seek players interpreted the inquiry as an offer of drugs for sale and said they did not want anything. Words were exchanged and, within minutes, a group of 12 to 15 males, wearing red and armed with rocks, bats, bottles, and wooden sticks with nails sticking out, began to attack. The armed group, including the minor, yelled "Norte" as they attacked. One of the victims was stabbed in the lower back. Another victim was hit in the shoulder with a bottle, and a third victim suffered a contusion and two-inch laceration to his head. Several more also suffered injuries and were treated at the scene.

A short while later, the police located the car driven by some of the attackers outside a nearby home. Defendant, a "known member of the Norteno criminal street gang," was inside the house with several other known gang members. The police found a large amount of marijuana in the house, and a knife with dried red fluid on it in the front yard.

## B. *Prior Petitions*

The original section 602 petition, filed on June 12, 2007, alleged that the minor, then age 14, obstructed a teacher and committed two misdemeanor batteries. It also alleged that one of the batteries was committed for the benefit of a criminal street gang. The minor admitted one count of battery and threatening a public officer. The street gang allegation was dismissed.

The dispositional study noted that the minor had failed nearly every class during the preceding two years and his truancy was so severe he had been referred to the school attendance review board. According to the minor, his absences were caused primarily by complications related to his diagnosed diabetes. He was receiving special education services and had an individualized education program. The minor also acknowledged that he used marijuana to alleviate depression. On August 22, 2007, the court adjudged the minor a ward of the court and placed him on probation subject to no weapons and no gang association conditions, and ordered individual and family counseling.

---

[2] The statement of facts is based upon the detention report because the parties stipulated that the report provided a factual basis for the minor's admissions to the sustained charges, and the court accepted the stipulation.

On November 27, 2007, a subsequent petition alleged that on September 28, 2007, defendant carried a dirk or dagger for the benefit of a criminal street gang (count one), carried a switchblade knife for the benefit of a criminal street gang (count two), and on November 22, 2007, again carried a dirk or dagger (count three). He admitted count one, and the court dismissed the remaining counts and enhancements. The court deemed count one to be a felony.

The dispositional study reported that the minor had not made any progress while on probation. He had only attended school two days in the fall semester. He had not attended the required drug, alcohol, and family counseling, nor had he completed any of the required community service hours, or written a court-mandated letter of apology and essay. The minor's father believed his son's behavioral problems were related to depression caused, in part, by the diagnosis of diabetes he received at age 11.

On January 3, 2008, the court continued the wardship and referred the minor to the Repeat Offender Prevention Program (ROPP) for intensive supervision. The probation conditions included a proscription against possession of weapons, a curfew, gang conditions, and a stay-away order naming several individuals.

Little more than a month later, on February 6, 2008, the probation officer filed a section 777 probation violation notice alleging that the minor had not attended school and had violated his curfew. On February 13, 2008, the minor admitted the probation violation and the court placed him on home electronic monitoring. He attended school on February 14. On February 20, he returned to school after a holiday but was two and a half hours late and threatened another student.

The minor's father reported to the probation officer that the minor was out of control. The father had "talked to the minor's doctors regarding his health issues, and the doctors informed him that not everyone conforms to treatment appropriately. The minor's health issues stem from the minor's unwillingness to accept that he has diabetes and treat it appropriately. [The father] says he has tried to take control of the minor's treatment, however the minor, at times, refuses to take his insulin shots. [The father] stated [he] has gone so far as to give the minor his shot when he is sleeping, however, this action is also dangerous for the minor. Neither the minor's father nor his doctors have devised a treatment plan that the minor has followed appropriately. . . . [The father] believes the minor needs therapy to learn how to accept his illness and treat it appropriately." The report noted that the minor "has had the opportunity to receive counseling services through David Grant Medical Center, but

he has not been cooperative with that treatment either." The minor was still on the waiting list for ROPP, an intensive supervision program that deals with young juveniles.

On February 27, 2008, the court continued the wardship and ordered six mandatory weekends of detention, and an additional 30 days on home electronic monitoring.

On May 19, 2008, the probation officer filed another probation violation notice alleging that the minor had failed to attend school since mid-February, tested positive for alcohol and marijuana, had been cited by the police for violating curfew, missed a probation appointment because he refused to get out of bed, and failed to appear for one of his mandatory detention weekends. The minor also failed to appear at the first hearing on the probation violations and a bench warrant issued.

He appeared on the bench warrant return on May 28. The court appointed a doctor to perform a psychological evaluation. On June 18, 2008, the minor admitted several probation violations.

The next day he committed the offenses that resulted in the current petition. The probation officer requested that the minor be in physical restraints during court proceedings because, while at juvenile hall, he aided a Norteño detainee involved in a fight with another juvenile.

## C. *Dispositional Hearing*

The dispositional report summarized the psychological evaluation. The appointed psychologist found no psychotic or neurological problems. The tests indicated the minor showed some insensitivity to the suffering of others, and the minor acknowledged he saw nothing "wrong with using others to get what he wants." The psychologist recommended a "medical evaluation for help with his chronic pain symptoms and diabetes." He also stated that the minor "needs a structured, supportive environment away from gangs or similar criminal associations that he may have turned to for support and understanding not provided by his family."

The dispositional report noted the minor had "been before the Court for violations . . . on five separate occasions. The only term that he has completed is his financial obligation. All of his remaining terms are outstanding and the minor and his father have been referred by [both his present and] previous probation officer[s] . . . for counseling services. Also, the minor's principal at Travis Community Day[ ] has informed the . . . father that the minor needs counseling. However, there has been no follow through with counseling."

The report concluded, based upon the facts underlying the current petition and the prior petitions and the minor's performance on probation, that the minor posed a serious danger to the community and required long-term treatment in a secured facility.

The Juvenile Placement Screening Committee (Committee) screened his case. The Committee concluded New Foundations was not appropriate because it is a short-term placement where the minor could earn furloughs after two months, and it was not likely that family reunification and substance abuse treatment could be achieved in that short a period. The Committee found Fouts Springs Youth Facility (Fouts) to be inappropriate because it was "primarily a behavior modification program and does not have 24 hours medical staff for the minor's diabetic needs that he requires, nor does it offer family counseling." It found Challenge inappropriate because it did not provide substance abuse counseling or family counseling and the minor would not receive intensive supervision upon release from the program. The Committee also found placement in a group home was not a placement alternative because, due to the serious and violent nature of the offenses, it was "highly unlikely" that the probation department could find a high-level group home to accept him. Nor would a group home adequately address the need for public safety because they are usually located in residential neighborhoods.

The probation officer recommended that the minor be committed to the DJJ where both the goals for rehabilitation and protection of the community would be addressed. The DJJ would evaluate the minor to develop a treatment plan, including "substance abuse, impact on victims of crime training, schooling, [and] medical needs." At DJJ, the minor would have the opportunity to earn a high school diploma and receive vocational training. The DJJ would also offer family counseling in a secure setting. When he turns 18 and becomes eligible for parole, DJJ offers transitional adult living services, if the minor were to choose not to reunify with his family. Six months prior to release, if it is determined that he has significant substance abuse issues, he would be housed in a rehabilitation unit. The DJJ would also retain jurisdiction of the minor until age 25, and can provide postrelease supervision services. The probation officer concluded that the DJJ was "the most comprehensive treatment plan available for the minor in addressing both community safety and the most appropriate services for the minor."

At the dispositional hearing on August 29, 2008, the minor's father testified that, as a young child, the minor had loved going to school. He became depressed when he was diagnosed with diabetes, and his school difficulties began after the diagnosis. His defiant behavior began at about age 12, and he became difficult to control. His diabetes is controllable with

medication, but even while in juvenile hall, where he received medication daily, "his numbers" were "still running high," and the minor needed to see a doctor to increase his medication. When the minor does not receive his proper medication he gets weak. If his blood sugar level gets too high or low, he can very easily become disoriented. His father acknowledged that he had difficulty controlling the minor. While living at home the minor had not attended school "for almost a year" and did not complete any of the terms or conditions of probation. The minor's father did not condone carrying a knife, and was unaware that his son was doing so.

The probation officer testified that in January of 2008 the minor was referred to ROPP. By May of 2008 he was on the top of the waiting list, but he was taken off the list when he was placed in custody for another offense. The probation officer noted that the minor had also been on the ankle monitor, and given mandatory weekend detention, but continued to reoffend.

In terms of out-of-home placement, when asked whether, "but for the diabetes issue, your recommendation might have been for Fouts," the probation officer replied that "it might have been." She confirmed that Fouts did not have the medical staff or treatment the minor needed. She explained that Fouts was inappropriate because the minor is a diabetic, and Fouts did not have a "24-hour medical staff," nor did Fouts offer family counseling.

With respect to other alternatives, she repeated the same factors enumerated in the dispositional report that rendered New Foundations, Challenge, or a group home inappropriate or ineffective placements. She also testified that there were no other out-of-home placement facilities.

With respect to DJJ, the probation officer described all of the services available that would benefit the minor, including a "24-hour medical staff." Among the criteria she used in making the DJJ recommendation were "the seriousness of the offense, the fact that this is his third offense for using and being in possession of a knife," the injuries to the victims, and that the minor initially denied any gang affiliation and did not recognize the seriousness of the offense. Other factors she relied on were that neither being on probation nor being on the ankle monitor had deterred the minor from reoffending, and he had reoffended before he could be placed under more intensive supervision in the community.

After hearing argument from counsel,[3] the court found the minor could no longer remain in the custody of his father. In reference to an earlier

---

[3] Defense counsel did not argue that defendant should be placed at Fouts. Instead he argued that Challenge was an appropriate placement. On appeal defendant does not reassert the contention that Challenge was an appropriate alternative to DJJ.

off-the-record discussion concerning placement, the court asked rhetorically: "What alternative [to DJJ] does the court have in the face of the programs that are available to me?" The court stated that Fouts could have been an appropriate placement because it would meet many of the minor's needs, except that "it is physically remote. It is probably at a minimum an hour to two hours for medical care. And although the staff at that facility are excellent and would provide wonderful personal care to the minor, they could not meet his medical needs." It found "New Foundations is inappropriate given . . . his history of violence, possession of weapons, so that program is out," and that Challenge met none of his treatment needs.

The court concluded: "So it is not with any joy nor is it without some concern that the only alternative available to the Court is the Department of Juvenile Justice." The court emphasized it would closely review the progress reports the DJJ is now required to submit, and if the minor were not progressing, or his needs were not being met, the court could "recall the case and review it and determine whether that placement continues to be appropriate."

## II. ANALYSIS

■ One of the primary objectives of juvenile court law is rehabilitation, and the statutory scheme contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at the DJJ. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576–577 [258 Cal.Rptr. 540] (*Teofilio A.*).) Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted. (*In re Ricky H.* (1981) 30 Cal.3d 176, 183 [178 Cal.Rptr. 324, 636 P.2d 13]; *In re Asean D.* (1993) 14 Cal.App.4th 467, 473 [17 Cal.Rptr.2d 572]; *Teofilio A., supra,* 210 Cal.App.3d at p. 576.) A DJJ commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate. (*In re Pedro M.* (2000) 81 Cal.App.4th 550, 555–556 [96 Cal.Rptr.2d 839].)

Before we address the minor's contention that the court order committing him to the DJJ violates the ADA, we emphasize that this is *not* a case in which the court failed to consider less restrictive alternatives, or where the evidence does not support the court's finding of a probable benefit. Indeed, the minor does not even suggest that the court's dispositional order was an abuse of discretion, and such a contention would, in any event, be unavailing.

First, the record demonstrates the court considered every available less restrictive placement, and gave reasons supported by the evidence why Challenge and New Foundations were not appropriate. With respect to Fouts, the court reluctantly rejected this alternative after determining that although many of its programs were appropriate for the minor, the staff would be unable to meet his medical needs, and due to its remote location there was inadequate access to off-site medical care. The court's findings regarding the minor's medical needs and the inability of the Fouts staff to meet them is supported by the probation officer's testimony, and was confirmed by the court's independent knowledge concerning the location of the facility.

The probation reports also included many references to the fact that the minor needed to be under the care of a doctor, had not taken charge of his own treatment, denied his condition, and failed to treat it properly. According to the father, the minor could easily become disoriented if his diabetes is not treated properly. Even under close supervision while detained at juvenile hall, the minor's diabetes was not completely under control, and he needed to see a doctor to adjust his medication. The minor did not offer any evidence to refute the probation officer's testimony that management of the minor's medical condition would require a 24-hour medical staff and that Fouts did not have the appropriate medical staff on site, or nearby.[4] Therefore, substantial evidence supports the court's stated reason for finding placement at Fouts would be inadequate or ineffective, i.e., that it would not meet the minor's medical needs.

Second, the court's finding that the DJJ commitment would be of probable benefit is amply supported by the probation officer's testimony concerning the treatment plan, the presence of a "24-hour medical staff," the opportunity to earn a high school diploma, and the availability of family counseling, substance abuse rehabilitation, vocational training, and postrelease supervision services.

## A. *ADA Claim*

 Rather than attempting to demonstrate that the dispositional order was an abuse of discretion, the minor contends the trial court's decision not to place him at Fouts and instead to commit him to the DJJ violated the ADA

---

[4] In his opening brief, the minor cites evidence found on a Web site that Fouts did at least have a nurse present on site. This information is not properly before us because it was not presented to the juvenile court, and we may not consider it. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1183 [74 Cal.Rptr.2d 121, 954 P.2d 384] ["[O]ur review on a direct appeal is limited to the appellate record"].) Therefore, for purposes of our analysis of any issues on appeal, we accept the court's finding that treatment of the minor's diabetes required a 24-hour medical staff, and that Fouts did not have a 24-hour staff on site or nearby.

because the court based its decision solely upon his disability, i.e., diabetes. "To state a claim of disability discrimination under Title II, the plaintiff must allege four elements: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." (*Thompson v. Davis* (9th Cir. 2002) 295 F.3d 890, 895 (*Thompson*).) We shall assume for the purpose of our analysis that the minor's diabetes does constitute a disability, as defined by the ADA. Nonetheless, his ADA argument fails for several reasons.

First, the minor did not raise the ADA issue below, or even argue that a placement at Fouts was appropriate. In fact, defense counsel urged the court to place him at *Challenge*, not Fouts. Counsel did mention Fouts and the minor's diabetes, but only in support of the argument that the court should place him at Challenge.[5] He did not make an ADA discrimination claim, nor request or suggest an accommodation to facilitate a placement at Fouts. Consequently, the People have had no notice or opportunity to introduce relevant evidence, or raise any defenses, and the court had no opportunity to address the issue in making its dispositional order. Therefore, assuming arguendo the ADA issue could be raised and litigated in the context of the dispositional hearing, the issue would, in any event, be waived. (Cf. *People v. Scott* (1994) 9 Cal.4th 331, 351–353, 356 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; see *People v. Planavsky* (1995) 40 Cal.App.4th 1300, 1302, 1310–1312 [47 Cal.Rptr.2d 723] [convicted narcotics offender waived the issue of failure of court to determine whether he should be committed to the California Rehabilitation Center pursuant to Welf. & Inst. Code, § 3051 by not raising it at sentencing]; *People v. Lizarraga* (2003) 110 Cal.App.4th 689, 691–692 [1 Cal.Rptr.3d 865] [same].)

Second, even if not waived, we have found no authority to support the minor's novel contention that an ADA claim may be raised in the context of a section 602 dispositional hearing, and that an otherwise valid dispositional order can be reversed on the ground that it violated the ADA. Although no published decision has considered such a proposition with respect to a DJJ commitment order, one court has rejected a similar attempt to raise an ADA claim in an appeal of an order in a juvenile dependency proceeding. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127 [98 Cal.Rptr.2d 715] (*Diamond H.*),

---

[5] Specifically, counsel argued that the court should consider the dispositions of the other juveniles involved in the attack, so the minor would not "feel he was unfairly treated simply because . . . his diabetes excluded him from Fouts or his diabetes got him into DJJ."

disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 749, fn. 6 [110 Cal.Rptr.2d 828, 28 P.3d 876].)

■ In *Diamond H.* a developmentally disabled mother contended on appeal that the juvenile court's decision to deny reunification services pursuant to section 361.5, subdivision (b)(10), violated the ADA. The court held that the ADA claim could not be raised in the context of the juvenile dependency proceedings. It reasoned: "In response to the discrimination faced by disabled individuals, Congress enacted the ADA (42 U.S.C. § 12101 et seq.). Title II of the ADA prohibits excluding qualified individuals from participating in or being excluded from the services, programs or activities of a public entity. Title III provides that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommo-dation. Both provisions apply to state and local public entities. [Citations.] [¶] In enacting the ADA, however, Congress did not intend to change the obligations imposed by unrelated statutes. Although a parent *may have a separate cause of action under the ADA based on a public entity's action or inaction, such a claim is not a basis to attack a state court order.* [Citations.] Thus, the ADA does not directly apply to juvenile dependency proceedings and cannot be used as a defense in them. . . . [¶] . . . [A]ny challenge a parent has under the ADA for alleged violations must be raised in a separate cause of action in federal court." (*Diamond H., supra*, 82 Cal.App.4th 1127, 1138–1139, italics added.)

We find the analysis in *Diamond H.* to be equally applicable where a minor found to be a person within the meaning of section 602 is attempting to assert an ADA violation as grounds to set aside an otherwise valid dispositional order. In addition to the reasons stated in *Diamond H.*, we observe that achieving the important rehabilitative and treatment goals of the juvenile proceedings would be severely hampered if, whenever the court considers, as it must, a minor's physical or psychological problems in assessing whether a particular placement would be effective, its decision could trigger an ADA claim that the court would have to allow the parties to litigate before reaching a final disposition. The obvious delays and procedural and substantive problems that would follow from importing what is, in effect, a new and complex civil action into the juvenile proceedings, is not mandated by the ADA, which instead provides a remedy by way of an independent civil action.

The minor's reliance upon decisions that have applied the ADA to chal-lenge exclusion of certain classes of prisoners from parole or certain prison programs is misplaced because, in each of the cases the minor cites, the plaintiffs raised their ADA claims in a separate civil action.

In *Stevens v. Harper* (E.D.Cal. 2002) 213 F.R.D. 358, 374–375, the court denied a motion to dismiss the individual claims of several minors. The court held the minors adequately alleged a cause of action under the ADA against the director of the California Youth Authority (CYA) claiming they had been unable to participate in certain CYA programs because the CYA failed properly to accommodate their disabilities. These ADA claims were brought in an independent action against the CYA, not, as here, raised in the context of an appeal of a dispositional order of the juvenile court.

In *Pennsylvania Dept. of Corrections v. Yeskey* (1998) 524 U.S. 206 [141 L.Ed.2d 215, 118 S.Ct. 1952], a court sentenced the plaintiff to serve time in a Pennsylvania correctional facility with a recommendation that the time be served in a motivational boot camp for first-time offenders which could result in early release. The Department of Corrections thereafter denied the plaintiff admission to the boot camp because of "his medical history of hypertension." (*Id.* at p. 208.) The plaintiff did not attempt to raise the ADA issue in the context of the criminal proceeding. Instead, he filed a civil complaint alleging the Department's decision to exclude him from the boot camp program violated the ADA. A unanimous United States Supreme Court ruled that "the statute's language unmistakably includes State prisons and prisoners within its coverage" (524 U.S. at p. 209), but nothing in its decision remotely suggests the ADA claim could have been asserted in the context of a criminal proceeding seeking to set aside the court's sentencing decision.

Finally, in *Thompson, supra*, 295 F.3d 890, two California inmates filed a civil complaint against "various state officials who have a role in the parole process," alleging that the inmates had been denied "full and fair consideration for parole based on their disability of drug addiction." (*Id.* at p. 894.) The prisoners did not raise the ADA issue in the context of an appeal or writ review of their individual parole decisions. Instead, they initiated a civil action seeking prospective injunctive relief against what they alleged to be a blanket policy of denying parole even to recovered drug addicts in violation of the ADA. (295 F.3d at pp. 894–895.) The Ninth Circuit held the ADA applied to the substantive decisionmaking process of a parole board. (295 F.3d at p. 899.) It further held, the prisoners "may state a claim under Title II based on their allegations that the parole board failed to perform an individualized assessment of the threat they pose to the community by categorically excluding from consideration for parole all people with substance abuse histories." (*Id.* at p. 898, fn. 4.) *Thompson* stands only for the proposition that the ADA may apply to the substantive decisionmaking process of a parole board if based upon a categorical policy to deny parole to prisoners with a disability. As in the other cases the minor relies upon, the ADA violation was raised in an independent civil complaint, not in the context of the parole hearing itself or an appeal of the parole decision.

█ We need not resolve the minor's assertion that, by analogy to *Thompson*, the ADA should also apply to the substantive decisionmaking process of a juvenile court in selecting the appropriate placement because neither *Thompson* nor any of the other foregoing decisions support his essential *procedural* premise that the ADA violation can be raised in the context of a direct appeal from a dispositional order, rather than by means of a complaint in an independent civil action.[6]

## B. *Due Process*

Finally, the minor asserts that it is a violation of due process to commit him to the DJJ solely because he has diabetes and no other less restrictive placement met his medical treatment needs.

█ Even without resort to principles of due process, it is an abuse of discretion to commit a minor to DJJ solely because of the absence of local less restrictive alternatives. (See, e.g., *In re Aline D.* (1975) 14 Cal.3d 557, 565 [121 Cal.Rptr. 816, 536 P.2d 65].) Here, however, our review of the record satisfies us the court did not base its decision on the lack of local less restrictive alternatives. Although the court clearly expressed a preference for Fouts were it not for the problem of the lack of a 24-hour medical staff, the court *also* determined the minor would benefit from the treatment provided by DJJ, and substantial evidence supported its finding of probable benefit. Thus, this is not a case in which the court finds a DJJ commitment *inappropriate*, but orders it anyway due to the absence of any local less restrictive alternative. (Cf. *In re Aline D., supra*, 14 Cal.3d at p. 565.) "If two programs are found appropriate and one is found unavailable for whatever reasons, the court should not be hindered in view of the situation before it from choosing the perhaps less desirable program." (*In re Gerardo B.* (1989) 207 Cal.App.3d 1252, 1258 [255 Cal.Rptr. 339].) It was entirely fair, and consistent with the rehabilitative goals of juvenile law, for the court to consider which placement would better meet the minor's medical needs.

█ In any event, we see no analogy between the juvenile court's decisionmaking process in this case, and the cases the minor cites in which the disposition is based upon improper factors such as the minor's exercise of his constitutional right to contest charges (see *In re Edy D.* (2004) 120 Cal.App.4th 1199, 1202 [16 Cal.Rptr.3d 293]), or a violation of an unconstitutional probation condition (see *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1084–1086 [22 Cal.Rptr.2d 893]). Here the court's decision was based upon

---

[6] For the first time in his reply brief, the minor also asserts the dispositional order violates section 504 of the Rehabilitation Act, 29 United States Code section 794, and Government Code sections 11135 and 12926. This court will not consider new material raised for the first time in a reply brief because the opposing party is deprived of a meaningful opportunity to respond.

proper factors including the court's assessment of the minor's medical treatment needs, and its assessment of which placement was best equipped to meet those needs.

## III. CONCLUSION

The dispositional order is affirmed.

Marchiano, P. J., and Graham, J.,* concurred.

---

*Retired judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.