Filed 10/19/21  In re J.A. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.A.,<br><br>Defendant and Appellant. | F082452<br><br>(Super. Ct. No. 19JQ0006A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Two recent senate bills have made significant changes for minors deemed wards of a juvenile court. On September 30, 2020, Senate Bill No. 823 (2019-2020 Reg. Sess.) (Senate Bill 823) became effective. This bill initiated the significant changes, which we explain below. On May 14, 2021, Senate Bill No. 92 (2021-2022 Reg. Sess.) (Senate Bill 92) became effective. This bill made some amendments to the laws implemented by Senate Bill 823.[1]

Through these bills, the Legislature has reduced the maximum period of confinement a juvenile ward faces when committed to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). Before this change in law, a ward could be committed for the *maximum* term an adult would face if convicted of the same offense. (Former Welf. & Inst. Code, § 731, subd. (c).)[2] Under the current law, however, a ward shall not be committed to DJJ "for a period that exceeds the *middle* term of imprisonment that could be imposed upon an adult convicted of the same offense." (§ 730, subd. (a)(2), italics added.)

In addition, the Legislature has announced its intent to close DJJ, which will be effective June 30, 2023. (§ 736.5, subd. (e).) Commencing July 1, 2021, responsibility for all juvenile wards will shift to county governments. (*Id.* at subd. (a).)

Finally, the Legislature has announced that, beginning July 1, 2021, a juvenile court (with certain limited exceptions) may no longer commit a ward to DJJ.[3] (§ 736.5, subd. (b).)

---

[1]    Senate Bill 823 was operative from September 30, 2020, to July 1, 2021. As of January 1, 2022, it will be deemed repealed. (See former Welf. & Inst. Code, § 731, subd. (d).)

[2]    All future statutory references are to the Welfare and Institutions Code unless otherwise noted.

[3]    The exceptions are as follows: "Pending the final closure of [DJJ], a court may commit a ward who is otherwise eligible to be committed under existing law and in

2.

In the present matter, appellant was adjudged a ward of the juvenile court on February 10, 2021, well after the effective date of Senate Bill 823. He was committed to DJJ because, according to the juvenile court, local services were not helping him and his criminal behavior was increasing in severity.

On April 12, 2021, the juvenile court was made aware that the maximum period of confinement it had imposed was erroneous, and it modified that term to comply with the new law. The court, however, did not reconsider its decision to commit appellant to DJJ.

Appellant asks this court to reverse his disposition in light of Senate Bill 823. He contends the juvenile court failed to exercise informed discretion when considering his placement at DJJ because the court never considered Senate Bill 823 or its policy changes.

We disagree that remand is appropriate. Although the juvenile court did not address Senate Bill 823 when committing appellant to DJJ, the court made a very thoughtful and reasoned decision. At the time of this disposition, the DJJ placement was authorized and it was appropriate based on appellant's particular needs. The court modified appellant's maximum period of confinement to comply with the change in law. We find neither legal error nor an abuse of discretion. We affirm.

## BACKGROUND

We provide a relevant summary of the procedural history of this matter, along with the juvenile court's reasons for committing appellant to DJJ.

## I.   Appellant Admits Certain Charges Against Him.

In December 2020, an amended juvenile wardship petition was filed pursuant to section 602 alleging that appellant committed the following four crimes:

---

whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed. The court shall consider, as an alternative to commitment to the [DJJ], placement in local programs, including those established as a result of the implementation of Chapter 337 of the Statutes of 2020." (§ 736.5, subd. (c).)

(1)     Attempted murder (Pen. Code, §§ 664/187, subd. (a); count 1);

(2)     Shooting at an occupied motor vehicle (Pen. Code, § 246; count 2);

(3)     Assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); count 3);[4] and

(4)     Misdemeanor possession of a controlled substance (Health & Saf. Code, § 11375, subd. (b)(2); count 4).

In January 2021, appellant admitted the allegation in count 3, along with an accompanying firearm enhancement.  The prosecution dismissed the remaining counts and allegations.

## II.     The Facts Supporting The Charge In Count 3 And The Firearm Enhancement.

The prosecution informed the juvenile court that facts supported appellant's admission.  According to the prosecutor, the People would present evidence, through testimony and video, that appellant was walking near a particular street on November 10, 2020, when he fired a handgun multiple times at a passing vehicle.  Officers located the victim's vehicle, and "a fresh bullet hole" was observed in the driver's side door.

After the prosecutor made this offer of proof, appellant admitted to the court that these facts had occurred.  The court found that a factual basis existed for appellant's admission, and it found true the allegation in count 3, along with the firearm enhancement.

## III.    The Disposition Hearing.

The disposition hearing occurred on February 10, 2021.  We summarize the relevant portions of that hearing.

---

**4**     Enhancements for benefiting a gang (Pen. Code, § 186.22, subd. (b)(1)(C)) and personal use of a firearm (Pen. Code, § 12022.5, subd. (a)) were alleged in connection with count 3.

## A. The report from probation.

Prior to that hearing, the probation department submitted a disposition report. The probation report listed appellant's criminal history, and it listed two possible options for appellant: (1) an undefined "out-of-home" placement and (2) DJJ. The probation officer, however, stated that an "out-of-home" placement was not being considered, but if appellant was granted probation, appellant would be "referred to local services to assist in his rehabilitation."

The probation report indicated that, in January 2021, the probation officer had received a response from a parole agent regarding appellant's eligibility for placement at DJJ. Appellant was eligible for a commitment to DJJ, with eligibility for parole at 18 months following acceptance, with jurisdiction ending at age 25.

The probation officer recommended that appellant be committed to DJJ because of his "criminal history" and the "egregiousness" of the current matter. The officer stated it appears appellant "may have exhausted all his opportunities at the local level for further growth." The officer believed that appellant's behavior "is escalating more violently with each referral/petition." The officer noted that DJJ would expose appellant with "victim awareness, gang offender program, educational and future employment opportunities should he meet the appropriate stages and levels of treatment."

The probation report was silent regarding Senate Bill 823, which had already gone into effect.

## B. The comments from appellant's counsel at the hearing.

At the disposition hearing, appellant's counsel asked the court to leave appellant "in the juvenile center for the maximum amount of time" and not to send him to DJJ. Appellant's counsel admitted that appellant "has been here several times before and has done all of the programs here before …." His counsel admitted that appellant had experienced "behavior problems" at the juvenile center, both previously and currently.

5.

Nevertheless, counsel asked the court "to consider leaving [appellant] here in the juvenile center."

### C.     The juvenile court's comments at the hearing.

At the disposition hearing, the juvenile court noted that appellant's mother and grandmother did not believe appellant had committed the offense for which he had admitted was true. According to the court, the mother requested a second chance for appellant.

The court reviewed appellant's history, which was detailed in the probation report. He had been involved with probation since April 2017, when it was alleged he had committed a battery by punching another person in the face. The probation department had warned appellant, and the case was closed.

In February 2018, it was alleged he had possessed a concealed dirk or dagger, and he had a curfew violation. An eight-inch knife had been located in appellant's pocket. The probation department warned him, and the case was closed.

In June 2018, it was alleged appellant had committed battery by striking another victim in the face. He was cited by the police department, and the probation department gave him a warning. The case was closed.

A little over one month later, in July 2018, appellant was reported as a runaway by his mother. The probation department warned him and the case was closed.

In January 2019, appellant was adjudged a ward of the juvenile court for carrying a loaded firearm on his person in a city, and for possession of the firearm with its identifications removed. He was placed in custody at the juvenile center for 78 days.

In June 2019, appellant appeared before the juvenile court for a violation of probation when he absconded from home. He had failed to attend school on a daily basis and he had failed to attend a court hearing. He was again adjudged a ward of the court, and he was ordered to complete 120 days in the local juvenile center. While he was in

6.

the juvenile center, appellant received 37 rule violation reports. Those violations included (1) threatening other youth; (2) disrespecting staff; (3) refusing to participate in programming; (4) gang-related tagging in instructional books; and (5) using inappropriate language. The probation department filed a violation of probation, and the court extended his commitment for an additional 90 days.

On May 26, 2020, approximately three months after appellant was released from custody on his prior violations of probation, another violation of probation was filed over various concerns, including (1) his termination from a particular class; (2) his failure to enroll in school; (3) his failure to enroll in counseling; and (4) his failure to advise probation of his status. Appellant was ordered to complete 60 days in the local juvenile center.

On September 10, 2020, appellant violated probation while in the juvenile center. "He and two other coparticipants conspired to attack three other in-custody youths." During this incident, appellant shouted, "This is Norte! Fuck Crips!" An officer ordered appellant to stop, and appellant again shouted, "This is Norte!" Due to this altercation, appellant was again adjudged a ward of the court, and he was ordered to complete his maximum confinement time that had been previously ordered for the prior violation of probation.

On November 10, 2020, a few weeks after appellant ended his custody time in October 2020, the present incident occurred wherein appellant fired a handgun multiple times at a passing vehicle on a public street.

Given the number of his prior "chances," the court stated its belief that appellant had not shown he wanted "to change his behaviors or move in a different direction." The court noted that appellant's actions had been escalating. The court saw nothing to suggest appellant "has any desire to or will even try to participate in the local services that have been provided to him." According to the court, it was "uncommon" for a minor in the juvenile center to receive 37 negative write-ups. The court was concerned that, if

7.

appellant could not comply with the rules while he was being supervised 24 hours a day, seven days a week, there was no reason to believe he would comply if he was not in custody. The court expressed concern that appellant had "been given lots of opportunities to show the Court that he can comply with probation and he has not done so yet."

The court agreed with the recommendations of probation. The court considered appellant's past conduct, and the nature of the present matter. Appellant was adjudged a ward of the court, and he was committed to DJJ. The court determined that the maximum period of confinement was 19 years.[5] The court stated it found that appellant's "mental and physical condition and qualifications are such" that he would benefit "by the reformatory educational discipline and other treatment provided" by DJJ.

The court addressed appellant directly. The court stated that having him remain in the local juvenile center for a longer period of time would not benefit him because it did not have a lot of programming for him. According to the court, DJJ "has a ton of stuff" that would help appellant "decide whether or not you are going to continue down the road that you've been going on or whether or not you are going to decide that you want to do something different." The court stated, "I don't think that putting you in the juvenile center and sort of warehousing you there for a year would do anything to help you. In fact, given sort of your performance and behaviors in the juvenile center while you've been there in the past, I'm pretty confident it wouldn't help you at all. So I'm hopeful that [DJJ] will offer you programing that will allow you to complete school, will allow you to perhaps learn a vocation or a trade, will get you mental health treatment, will kind of help you do those things that we haven't been able to do for you locally here because it

---

[5] The maximum period of confinement of 19 years was based on the upper term of nine years for assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)) and the upper term of 10 years for the personal use of a firearm (Pen. Code, § 12022.5, subd. (a)).

8.

just hasn't worked out, okay?"  Appellant answered, "All right."  The court wished him "nothing but the best."

Following the disposition on February 10, 2021, appellant filed the present appeal on March 1, 2021.

## IV.    DJJ Alerts The Juvenile Court About The Maximum Period Of Confinement.

Via a letter dated March 29, 2021, DJJ alerted the juvenile court that appellant had been accepted into DJJ, but his delivery would be delayed due to COVID-19 related issues.  Via a second letter dated March 29, 2021, DJJ also alerted the court that appellant's maximum period of confinement warranted reconsideration due to a recent change in law to former section 731, subdivision (c).[6]

## V.    The Juvenile Court Reduces Appellant's Maximum Period Of Confinement.

On April 12, 2021, the juvenile court conducted a hearing regarding the status of appellant's transfer to DJJ.  During that hearing, the court was alerted about the letter from DJJ regarding the maximum period of confinement.  The court noted that, under the amended law, appellant could not be committed to DJJ for a period that exceeds the middle term of imprisonment that can be imposed upon an adult convicted of the same offense.  The court asked both parties if they had any objection to reducing appellant's maximum period of confinement.  Neither side objected so the court reduced appellant's maximum period of confinement to 10 years.[7]

---

[6]    Senate Bill 823 brought about this change.  Under the amendment to section 731, a court may not commit a ward to DJJ for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense.  This change in law is now expressed in section 731, subdivision (c).

[7]    The amended maximum period of confinement of 10 years was based on the middle term of six years for assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)) and the middle term of four years for the personal use of a firearm (Pen. Code, § 12022.5, subd. (a)).

The court spoke directly to appellant, explaining that the law had changed. The court stated it previously "made an order that your maximum confinement time was 19 years. And the law has changed that indicates that I can only sentence for the middle term. There's a low, a middle, and a high. And, traditionally, the juvenile court would sentence on the high term. That was the law at the time. And, now, it's changed recently to indicate that it needs to be the middle term. And the middle term for the offense is ten years, okay?"

At the hearing wherein appellant's maximum period of confinement was modified, neither the court, the probation department, nor the parties mentioned Senate Bill 823. Nobody discussed any other changes to this area of law, such as the future closure of DJJ.

## DISCUSSION

Appellant argues that his disposition should be reversed and his matter remanded for a new disposition hearing in light of Senate Bill 823. He asserts the juvenile court failed to exercise proper discretion because the court fashioned the disposition without knowledge of Senate Bill 823, including its policy changes and amendments to law. Appellant maintains that there is a reasonable chance the juvenile court would have chosen a different placement option had it known of Senate Bill 823, and the Legislature's determination to close DJJ. He contends that, if this matter is remanded, he may not legally be committed back to DJJ.

In contrast, respondent asserts that remand is not required. Respondent acknowledges that the juvenile court erred at the disposition when the maximum period of confinement was set at 19 years. Nevertheless, respondent notes that the court corrected the unauthorized disposition. Respondent further argues that the juvenile court considered appellant's circumstances and provided sufficient justification for committing appellant to DJJ. Respondent insists that a remand is futile because the court would not have changed its disposition. Finally, respondent contends the Legislature did not

10.

prohibit new commitments to DJJ prior to July 1, 2021. Thus, the disposition order was proper.

We agree with respondent and we reject appellant's arguments. Although the juvenile court did not analyze Senate Bill 823, the court made a very thoughtful and reasoned decision to commit appellant to DJJ. At the time of this disposition, the DJJ placement was authorized under the applicable statutes. Appellant's placement at DJJ was appropriate based on his needs. The court subsequently reduced appellant's maximum period of confinement to comply with the change in law. We conclude that a remand is not warranted.[8]

Before we analyze the juvenile court's disposition order, we summarize the Legislative intent for Senate Bill 823, which is instrumental for some of appellant's arguments.

## I. The Legislative Intent Behind Senate Bill 823.

In enacting Senate Bill 823, the Legislature made the following relevant statements. "Evidence has demonstrated that justice system-involved youth are more successful when they remain connected to their families and communities. Justice system-involved youth who remain in their communities have lower recidivism rates and are more prepared for their transition back into the community." (Stats. 2020, ch. 337, § 1, subd. (a), p. 3791.)

"To ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment, it is necessary to close [DJJ] and move the

---

[8] Appellant raises ineffective assistance of counsel if his claim for relief under Senate Bill 823 is deemed forfeited. Respondent, however, does not rely upon forfeiture. Thus, we decline to analyze whether or not ineffective assistance of counsel occurred because we address this claim on its merits.

11.

jurisdiction of these youth to local county jurisdiction."[9] (Stats. 2020, ch. 337, § 1, subd. (b), p. 3791.)

"It is the intent of the Legislature and the administration for counties to use evidence-based and promising practices and programs that improve the outcomes of youth and public safety, reduce the transfer of youth into the adult criminal justice system, ensure that dispositions are in the least restrictive appropriate environment, reduce and then eliminate racial and ethnic disparities, and reduce the use of confinement in the juvenile justice system by utilizing community-based responses and interventions." (Stats. 2020, ch. 337, § 1, subd. (e), p. 3792.)

Finally, the Legislature stated its intent "to end the practice of placing youth in custodial or confinement facilities that are operated by private entities whose primary business is the custodial confinement of adults or youth in a secure setting. It is further the intent of the Legislature to end placements of justice system-involved youth in out of state facilities that do not appropriately address the programming, service, safety, and other needs of placed youth once appropriate and sufficient capacity within California is achieved." (Stats. 2020, ch. 337, § 1, subd. (f), p. 3792.)

## II.     The Juvenile Court Did Not Abuse Its Discretion.

A juvenile court has broad discretion to determine the proper disposition of a ward under its jurisdiction. (*In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103–1104.) An abuse of discretion standard is used to review a juvenile disposition order, and such an

---

[9]     In Senate Bill 823, the Legislature enacted section 730 to provide for the following commitment options:  A juvenile court "may order any of the types of treatment referred to in Section 727, and as an additional alternative, may commit the minor to a juvenile home, ranch, camp, or forestry camp.  If there is no county juvenile home, ranch, camp, or forestry camp within the county, the court may commit the minor to the county juvenile hall." (§ 730, subd. (a)(1).)  In addition, a ward may be committed "to a sheltered-care facility." (*Id.* at subd. (a)(1)(B).)  A ward may also be placed "at the Pine Grove Youth Conservation Camp" if the ward meets certain placement criteria. (*Id.* at subd. (a)(1)(D).)

order will not be reversed "absent a clear abuse of discretion. [Citation.]" (*Id.* at p. 1104.)

### A. The court properly modified the maximum period of confinement.

The parties agree, as do we, that the originally imposed maximum period of confinement of 19 years was erroneous. The juvenile court, however, reduced this term to 10 years.

Appellant argues that the juvenile court never exercised its discretion in setting the length of his confinement. Appellant takes the position that the court delegated its authority to the probation department, and the court simply adopted the recommended modification without reconsidering all of the relevant facts and law. In addition, appellant asserts that the court made certain comments which shows it had "a routine practice" of imposing the highest possible term.[10] Appellant asks us to remand this matter to "send a needed signal to the juvenile court, reminding it of its duty to carefully consider each individual case and to determine a suitable outcome based on the individual factors before it." We reject these arguments and we conclude that the modification was proper.

First, the modified term complied with the new law. (§ 731, subd. (c).) The new period of confinement was based on the middle term of six years for assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)) and the middle term of four years for the personal use of a firearm (Pen. Code, § 12022.5, subd. (a)). We discern no error in this regard.

---

[10] Appellant's arguments stem from the following comments which the juvenile court made to appellant. The court stated it previously "made an order that your maximum confinement time was 19 years. And the law has changed that indicates that I can only sentence for the middle term. There's a low, a middle, and a high. And, traditionally, the juvenile court would sentence on the high term. That was the law at the time. And, now, it's changed recently to indicate that it needs to be the middle term. And the middle term for the offense is ten years, okay?"

13.

Second, the juvenile court retained jurisdiction to modify the disposition. Although this modification occurred after appellant had filed the present appeal, a lower court may correct an unauthorized sentence notwithstanding the pendency of an appeal. (*People v. Nelms* (2008) 165 Cal.App.4th 1465, 1472.) Further, an appeal does not divest a juvenile court of jurisdiction to issue an order impacting a minor's custody. (Code Civ. Proc., § 917.7.) A juvenile court is granted statutory authority to change or modify any prior disposition order. (§ 385.) For these reasons, we agree with respondent that the juvenile court's modification was proper.

Finally, a juvenile court retains authority to impose a period of confinement that is less than the maximum allowed under law. (See *In re Julian R.* (2009) 47 Cal.4th 487, 491–492 [a juvenile court may set a confinement period less than, but not more than, the maximum allowed].) A juvenile court is required to "consider the 'facts and circumstances' of the crime. [Citation.]" (*Id.* at p. 492.) A court "shall set a maximum term based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation." (§ 731, subd. (c).)

In this matter, we reject appellant's assertion that the juvenile court failed to exercise its own discretion, and we likewise reject appellant's position that the court automatically imposed the maximum term. During the original disposition hearing, although the court agreed with the recommendations from the probation officer, the court explained why it felt the maximum period of confinement of 19 years was justified. The court considered appellant's past conduct, and the nature of the present matter. Moreover, during the modification hearing, the court indicated that a low term existed. This comment strongly implies that the court understood it had discretion to set a maximum period of confinement that was below the middle term. Finally, the court's written order committing appellant to DJJ expressly states that the court considered the individual facts and circumstances of the case. In addition, that order (which appears on a

14.

judicial council form) also notes that the court had discretion to modify the maximum period of confinement.

We presume the juvenile court understood it could impose a lower term of confinement if it felt such an order was justified under the circumstances. (See *In re Julian R.*, *supra*, 47 Cal.4th 487, 498–499 [applying general presumption that a lower court knows and follows applicable law].) The evidence from this record does not reasonably rebut the presumption that the court understood its discretionary authority. Moreover, the facts and circumstances of appellant's behavior amply support the court's decision to not reduce appellant's maximum term of confinement less than 10 years. We discern no abuse of discretion and we conclude that the court's modification was proper.[11]

### B.     The commitment to DJJ was statutorily authorized.

At the time the court committed appellant to DJJ in February 2021, that placement was not prohibited by the applicable statutes. Indeed, the Legislature stated that commitments to DJJ would not be limited until July 1, 2021. (§§ 733.1, subd. (a); 736.5, subds. (a) & (b).) Moreover, the Legislature has stated that all wards committed to DJJ prior to July 1, 2021, "shall remain within its custody until the ward is discharged, released or otherwise moved pursuant to law, or until final closure of [DJJ]."[12] (§ 736.5,

---

[11]     Appellant requests that, if necessary, we should treat his notice of appeal (which was filed on March 1, 2021) as filed after the juvenile court issued its April 12, 2021, order modifying the disposition. We agree and we will treat his notice of appeal as being filed after the April 12, 2021, order modifying the disposition. (See Cal. Rules of Court, rule 8.406(d) [a reviewing court may treat a notice of appeal as filed immediately after the making of the applicable order].)

[12]     Under Senate Bill 823, subdivision (d) of section 736.5 stated that all wards committed to the DJJ prior to July 1, 2021, "shall remain within its custody until the ward is discharged, released or otherwise moved pursuant to law." (Stats. 2020, ch. 337, § 30.) Senate Bill 92 made a slight amendment to this subdivision. Pursuant to Senate Bill 92, the current version of subdivision (d) of section 736.5 reads that all wards committed to DJJ prior to July 1, 2021, "shall remain within its custody until the ward is discharged,

subd. (d).) The language from these statutes overwhelmingly establishes that, even after Senate Bill 823 went into effect, the court's disposition committing appellant to DJJ was statutorily authorized.

Finally, the probation report indicates that, in January 2021, the probation officer had received confirmation from a representative of DJJ that appellant was eligible for a commitment to DJJ. The officer was informed that appellant would be eligible for parole at 18 months following his acceptance, with jurisdiction ending at age 25.

Under these circumstances, appellant's commitment to DJJ prior to July 1, 2021, was permissible.

### C. The record supports the court's decision to commit appellant to DJJ.

"No ward of the juvenile court shall be committed to [DJJ] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by [DJJ]." (§ 734.) A juvenile court does not abuse its discretion in committing a ward to DJJ if evidence demonstrates both (1) a probable benefit to the minor from the commitment, and (2) less restrictive alternatives would be ineffective or inappropriate. (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.) An appellate court must indulge "all reasonable inferences to support the decision of the juvenile court." (*In re Asean D.* (1993) 14 Cal.App.4th 467, 473.)

In this matter, the juvenile court found that appellant's needs were best served by his commitment to DJJ. Evidence supports this finding.

---

released or otherwise moved pursuant to law, *or until final closure of [DJJ]*." (Stats. 2021, ch. 18, § 10, italics added.)

### 1. Evidence supports the decision that a commitment to DJJ would probably benefit appellant and less restrictive alternatives were not appropriate.

Both the probation department and the juvenile court expressed concern that the local services available to appellant had proven ineffective in assisting in his rehabilitation. The probation officer stated it appears appellant "may have exhausted all his opportunities at the local level for further growth." The officer noted that DJJ would expose appellant with "victim awareness, gang offender program, educational and future employment opportunities should he meet the appropriate stages and levels of treatment."

At the disposition hearing, the court spoke directly with appellant and the court stated that having him remain in the local juvenile center for a longer period of time would not benefit him because it did not have a lot of programming for him. According to the court, DJJ "has a ton of stuff" that would help appellant "decide whether or not you are going to continue down the road that you've been going on or whether or not you are going to decide that you want to do something different." The court stated, "I don't think that putting you in the juvenile center and sort of warehousing you there for a year would do anything to help you. In fact, given sort of your performance and behaviors in the juvenile center while you've been there in the past, I'm pretty confident it wouldn't help you at all. So I'm hopeful that [DJJ] will offer you programing that will allow you to complete school, will allow you to perhaps learn a vocation or a trade, will get you mental health treatment, will kind of help you do those things that we haven't been able to do for you locally here because it just hasn't worked out, okay?"

Appellant contends that, while the juvenile court may have expressed its dissatisfaction with the local juvenile hall as a placement option, this record does not rule out the availability of other potential options, such as juvenile homes, ranches, camps or forestry camps. (See § 730, subd. (a)(1).) Appellant asserts that the court might now select such a placement option over DJJ as being more appropriate and the least restrictive alternative. We disagree.

17.

The evidence in this record supports the decision that a commitment to DJJ would probably benefit appellant. The evidence also supports a finding that appellant had exhausted his opportunities for rehabilitation through local programs. In light of appellant's escalating criminal behavior, which we discuss below, it is clear that the court felt a DJJ commitment was appropriate for appellant.

## 2. Appellant's criminal behavior was escalating.

The probation officer recommended that appellant be committed to DJJ because of his "criminal history" and the "egregiousness" of the current matter. The officer believed that appellant's behavior "is escalating more violently with each referral/petition."

The juvenile court agreed with the probation report, and it also expressed concern over appellant's increasing criminal behavior. The court listed each of appellant's prior criminal acts. Instead of demonstrating rehabilitation, appellant's history exhibited increasing violence, culminating in the present charges that involved him discharging a firearm multiple times at a passing vehicle on a public street. The court clearly reflected its concerns regarding appellant's escalating criminal behavior. Moreover, appellant had demonstrated an inability to comply with the rules and regulations when he was in the local juvenile center. He received 37 write-ups, and he had numerous violations of probation. The court expressed its concern that this number of write-ups was "uncommon" and, if appellant could not comply with the rules while he was being supervised 24 hours a day, seven days a week, there was no reason to believe he would comply if he was not in custody. The court stated that appellant had "been given lots of opportunities to show the Court that he can comply with probation and he has not done so yet."

We reject appellant's assertion there is a reasonable chance the juvenile court would have chosen a different placement option had it known of the Legislature's intent

18.

to close DJJ effective June 30, 2023. Instead, appellant had exhausted local programming, and he needed additional support and services.

Based on this record, the juvenile court acted well within its discretion in committing appellant to DJJ.[13] The court was fully satisfied that appellant's mental and physical condition, and his qualifications, made it probable he would benefit by a DJJ commitment. (See § 734.) The evidence supports the court's findings, and it demonstrates both (1) a probable benefit to appellant from the DJJ commitment, and (2) less restrictive alternatives would be ineffective or inappropriate. (See *In re M.S.*, *supra*, 174 Cal.App.4th at p. 1250.) Accordingly, an abuse of discretion is not present, and we will not disturb the court's rulings.

## III.     We Need Not Address The Retroactivity Of Senate Bill 823.

The parties dispute whether or not Senate Bill 823 should apply retroactively to appellant. Appellant claims he should benefit from the "ameliorating legislation that came into effect" after his disposition. For example, the Legislature has expressed its intent, commencing July 1, 2021, to shift responsibility for juvenile wards from DJJ to local counties. Starting on that date, the Legislature has also prohibited new commitments to DJJ (absent certain limited exceptions). (§ 736.5, subds. (a) & (b).)

---

[13]     Respondent asserts that the juvenile court properly exercised its discretion, in part, because appellant's family declined to acknowledge that appellant committed the criminal conduct in the present offense. We disagree with respondent's view of the record. Although the court commented that appellant's mother and his grandmother did not think appellant had committed the latest crime, the court also acknowledged that appellant had admitted his criminal behavior. According to the court, appellant had recognized that his behavior was "serious" and "not appropriate." In addition, appellant expressed remorse during his interview with the probation officer. Contrary to respondent's suggestion, this record does not establish that the court based the disposition over concerns that appellant's family did not believe he had committed the present offense.

Respondent argues that appellant was properly committed to DJJ because his commitment occurred before July 1, 2021. (§ 736.5, subd. (b).) Respondent takes the position that this change in law is prospective and not retrospective.[14]

We need not fully respond to the parties' dispute regarding retroactivity. Instead, Senate Bill 823 was effective in 2020 well before appellant's original disposition, and well before he filed the present appeal. As such, we will presume that appellant benefits from all of its changes, including those that occurred after his disposition and this appeal. With that presumption in mind, however, a remand is not appropriate.

The Legislature has provided clear guidance on how juveniles, such as appellant, will be processed if they were committed to DJJ prior to July 1, 2021. All wards committed to DJJ prior to July 1, 2021, "shall remain within its custody until the ward is discharged, released or otherwise moved pursuant to law, or until final closure of [DJJ]." (§ 736.5, subd. (d).) The Legislature has directed DJJ to develop a plan, by January 1, 2022, "for the transfer of jurisdiction of youth remaining at [DJJ] who are unable to discharge or otherwise move pursuant to law prior to final closure on June 30, 2023." (§ 736.5, subd. (f).)

Based on these statutes, it is clear the Legislature has provided for wards such as appellant who were committed to DJJ prior to the cut-off date of July 1, 2021. As such, appellant benefits from Senate Bill 823. He will be transferred from DJJ when appropriate under the guidelines which DJJ has been directed to create. A remand is not warranted under these circumstances.

---

**14** Respondent concedes that the reduction of a ward's maximum period of confinement is ameliorative, allowing retroactive benefit to nonfinal judgments on appeal. We agree. The reduction of the maximum period of confinement would apply to those wards who have a nonfinal judgment on appeal. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 [an inference of retroactivity applies if a new law ameliorates the possible punishment for juveniles].)

20.

## **DISPOSITION**

The juvenile court orders appealed from are affirmed.


LEVY, J.

WE CONCUR:


HILL, P. J.


DETJEN, J.