Filed 3/26/24  In re Jacob W. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JACOB W. et al., Persons Coming Under the Juvenile Court Law. | B326065 c/w B326744 (Los Angeles County Super. Ct. No. 22CCJP03910 A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>S.S. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from  orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee.  Affirmed.

John Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant S.S.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant M.W.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel and Kelly G. Emling, Deputy County Counsel.

_____

S.S. (mother) has four boys, who are the children at the heart of the juvenile court proceedings. The two younger boys are Noah (born April 2017) and Ryan (born April 2018). Noah and Ryan's father, C.W., is not a party to the current appeal. The two older boys are Jacob (born February 2008) and Justin (born November 2009), and their father is appellant M.W. (whom we refer to as "father"). On December 14, 2022, the juvenile court declared all four children to be dependents under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j),[1] and removed them from parental custody. The two bases for dependency jurisdiction were: (1) mother and father's medical neglect of Justin, specifically their failure to take him to medical appointments in light of his Type 1 diabetes diagnosis, and mother's refusal to be trained to manage his diabetes and to provide his school with insulin (counts b-1 and j-1); and (2) mother's medical neglect of Noah, who was diagnosed with anemia, for failing to take him to scheduled medical appointments. Mother and father filed separate appeals.[2]

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father's appeal is B326744. Mother's appeal is B326065.

2

Having consolidated the two appeals by separate order, we resolve both appeals in this opinion.

On appeal, father challenges the jurisdictional findings against him, relating to Justin's diabetes. Mother separately appeals the jurisdictional findings as to both Justin and Noah, as well as the order removing all four children from parental custody. In addition, mother contends the juvenile court and the Los Angeles County Department of Children and Family Services (the Department) did not comply with the initial inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and section 224.2, subdivisions (a) and (b). We affirm the juvenile court's December 14, 2022 orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

In the time frame before they were detained from parental custody, all four children were living with mother, who was their primary caregiver. Justin, Noah, and Ryan all had physical exams in August of 2021. Noah was diagnosed with anemia, but was a no-show for a scheduled three-month follow-up visit, as well as for his five-year well child visit. Ryan, who had asthma and a speech delay, missed a follow up appointment in November 2021.

On January 30, 2022, Justin was hospitalized with Type 1 diabetes, and was not discharged from the hospital until February 9, 2022. The hospital social worker made a referral to the Department after Justin's discharge was delayed because mother had not yet taken the training in how to care for Justin's diabetes. The referral was closed after mother received the required training.

In March 2022, a new referral concerning potential domestic abuse by mother's male companion was also closed after mother demonstrated her ability to protect the children; mother left the male companion and was planning to move to a new apartment or to Sacramento to be closer to relatives. The investigating social worker for these two closed referrals noted that mother refused to sign consent forms or to submit to drug tests, and described mother as a conspiracy theorist with a distrust of the dependency system. Mother was initially resistant to Department involvement with the family, but was cooperative after the social worker was able to build a rapport with her. The fathers were not involved with the family, and mother struggled keeping up with the children.

Justin's school had received medical orders concerning his diabetes diagnosis on February 16, 2022, but when the school tried to inform mother that Justin was missing supplies for his diabetes monitoring and treatment, mother's voicemail was full. School records show a pattern of Justin being absent or not reporting to the nurse's station for blood sugar testing and administration of insulin. Between February and July 2022, Justin attended some medical appointments, mostly with a diabetes nurse, but missed both in person and virtual appointments with endocrinology. Justin's prescription for Lantus insulin was decreased in March 2022, but it appears that the school did not learn of the change in prescription until May when the school called the doctor's office for updated orders.

In early August 2022, the Department received a new referral for general neglect, based on concerns that the younger children lacked proper supervision and the older children were observed smoking marijuana. A different social worker, named

4

Delino, visited mother's apartment complex on August 18, 2022, and found the four children at home without mother. When Delino reached mother by phone, mother said everything was fine and the Department needed to leave her alone. Delino explained the concerns and emphasized to mother the need to meet her in person and to interview the children. Mother then took several steps to evade scrutiny, first agreeing to meet Delino and then instructing the children to leave the apartment and join her in her car where she was waiting outside. When Delino followed the children, mother drove around, directing the children to meet her at a different location; mother's instructions led the children to cross the street, putting them in potential danger. Mother disregarded Jacob's request that mother talk to Delino. Eventually, Delino met maternal grandparents, who confirmed mother's identity. Mother spoke with Delino briefly, first objecting to Delino's involvement, then explaining why she was too busy to meet, and ultimately agreeing to meet the following week.

The next day, August 19, 2022, Delino tried to meet mother at a scheduled doctor's appointment for Justin's physical. Mother first said she would not be there, as her son was refusing to go. Delino informed mother that failure to attend medical appointments would be a concern, given the Department's prior investigation. Mother arrived with the two younger children in a stroller, about 40 minutes late. Jacob was dropped off about five minutes later, making statements that appeared to be the result of coaching by mother, giving attitude and saying he didn't know why he had to be there. Mother commented that she could not force her children to go to the doctor if they did not want to come.

Mother rescheduled the appointment, as a physical was needed for her son to play sports.

Delino spoke to the doctor, who explained that there were significant concerns regarding Justin, who was considered medically fragile based on his recent Type 1 diabetes diagnosis, which would require lifetime monitoring and insulin medication. The doctor explained that the condition can be life threatening if Justin's glucose levels are not monitored, and his need for insulin could be compared one's need for oxygen. The doctor noted that Justin had seen the registered nurse, but had missed two appointments with the endocrinologist on April 25, 2022 and July 12, 2022. Mother had a history of not showing up for the children's follow up appointments. Mother was instructed in August 2021 to bring Noah to a follow up appointment for anemia in three months and a well child visit in one year, but had not. Ryan had a pending speech referral and was due for a physical.

Delino met with mother on September 1, 2021 and outlined the concerns about missing Justin's endocrinology appointments and not providing the school with medication. Mother denied Justin was sick, stating he had lost 60 pounds and the school had said he does not need medicine. She claimed she had only missed one appointment. When Delino explained to mother that she was being given the opportunity to resolve the concerns and asked mother to complete a drug test to verify her sobriety, mother grew more reactive and erratic.

While the Department's investigation was ongoing, a new referral was generated on September 8, 2022, because Justin had not been seen by a doctor in four months and had lost 60 pounds for unknown reasons, and because mother had refused to provide insulin to the school. Delino could not make contact with mother,

6

either in person or by phone, and the children's day care provider and football coach had not seen the children since September 5, 2022. The school nurse reported that she last checked Justin's blood sugar on September 1, 2022, but had not seen Justin since.

On September 13, 2022, mother provided the endocrine registered nurse, George Tobo, a glucose meter that showed only five readings for the prior four weeks. Although the glucose readings were good, the hospital could not confirm their accuracy, and mother refused to have Justin do a blood test that would check his A1C levels for the past six months, stating she did not have time. Mother returned to Tobo later the same day, asking for a doctor's letter stating that Justin did not need insulin. When Tobo explained that was not possible, mother asked for a letter that Justin's medication had been lowered. Contrary to mother's assertion that Justin had lost 60 pounds, Justin's weight had changed from 220 pounds in January 2022 to 208 pounds in September 2022, five pounds higher than his weight in May. Father told Tobo that mother was responsible for Justin, and father would not take Justin to the hospital. Tobo encouraged mother and Justin to have Justin wear a glucose monitor for two weeks and have the readings reviewed by a doctor, but was concerned that mother was avoidant and would not follow doctor's orders.

A school counselor at Justin's school reported that he has had behavioral issues since the third or fourth grade, including outbursts of anger, but when individual counseling was offered to provide him with healthy coping skills, mother refused services. Every time the school reached out, mother was combative and refused to take accountability, instead blaming the school for racially targeting her son. The children were chronically absent,

and mother refused to take accountability or respond in an appropriate manner.

Delino contacted various relatives to investigate placement options. Delino was unable to contact father, and father's wife reported she and father had a one-bedroom apartment and were in no position for the children to live with them. Paternal great aunt was willing to be a placement of last resort, and said she would encourage mother to cooperate with the Department. Maternal grandmother, who was also diabetic, insisted that Justin no longer had diabetes. She was unable to take the children as she had her own caregivers and lived in a one-bedroom apartment. Paternal grandfather and his girlfriend were willing to care for the children.

At a family engagement meeting on September 20, 2022, paternal relatives were willing to provide support for Justin's medical needs and the other children's educational needs. They acknowledged the need for cooperation with the Department and with mother to support the children's needs and prevent removal. Mother arrived to the family engagement meeting two hours late; she agreed to take the children back to school and take Noah and Justin for bloodwork to help doctors determine their medical needs.

Justin and his siblings returned to school on September 21, 2022; they stayed for only three hours before mother reportedly took Justin to the doctor. All the children were absent the following day. Justin completed his bloodwork, and was scheduled to see a doctor on October 3, 2022 to review the results.

On September 23, 2022, the Department conducted an emergency child and family team meeting to address concerns noted during the investigation, as a last effort to keep the

8

children with mother and prevent removal. Mother mistrusted social worker Delino, but appeared cooperative, signing consent forms. Mother was concerned about a neighbor who had threatened to kill her and her children; she had an upcoming hearing and was looking for housing. Delino said the plan would not work without knowledge of the children's whereabouts. On September 27 and 28, 2022, mother spoke to Delino, but was evasive about her whereabouts, stating she was being followed and harassed, and could not go back to her residence.

On September 30, 2022, the court issued a warrant to remove the children from mother's custody. The warrant application expressed concern that mother had demonstrated a lack of understanding of her children's medical needs, and was combative with both the medical and school system, as well as evasive and resistant with the social worker's efforts to address concerns.

On October 3, 2022, a doctor confirmed that Justin's A1C levels were good and his diabetes was under control. The doctor requested a follow up appointment in two weeks to further assess, and if Justin's levels remained good, his medication dosage would be lowered. The removal warrant was executed on October 3, 2022, in the hospital parking lot after Justin's doctor's visit. The children were placed with paternal grandfather and his girlfriend.

On October 5, 2022, the Department filed a petition alleging the children were subject to dependency jurisdiction under section 300, subdivisions (b)(1) and (j), based on four separate counts. Count one related to mother and father's medical neglect in connection with Justin's diabetes diagnosis. Count two related to mother's medical neglect of Noah and his

9

anemia diagnosis.  Count three alleged that mother's male companion had physically abused Justin.  Count four alleged father was unwilling to provide the children with ongoing care, supervision, and necessities of life.

At the detention hearing on October 6, 2022, the court scheduled a no-time-waiver adjudication for October 27, 2022. The adjudication was later continued to December 14, 2022, and the court ordered the Department to file a supplemental report before the continued hearing on parents' progress and the possibility of a voluntary contract under section 301 or section 360, subdivision (b), both of which authorize the Department to provide a program of supervision to protect a child, either with or without a finding of dependency jurisdiction, but without a disposition order.

In an interview with mother on October 17, 2022, mother acknowledged that Justin missed appointments on April 25, 2022 and July 12, 2022, but claimed that the fault lay with Justin, who refused to go to those appointments.  She agreed Justin would require lifelong monitoring, but said that based on his last doctor's visit, he only required insulin as needed.

In an interview with father on October 26, 2022, he said he had taken Justin and Jacob to the doctor on October 25, 2022, and he was trying to enroll in a diabetes class.

The children were interviewed on November 9, 2022.  Jacob and Justin were happy living with paternal grandfather, and felt good about being closer with father, but they wanted to return to live with mother eventually.  Jacob noted that Justin still needed more support, as he was embarrassed about his diabetes and having to go to the nurse.  Justin confirmed that he gets frustrated with his medical condition, stating he was tired of the

10

doctor's visits and embarrassed about having to go to the nurse at school.

On December 7, 2022, Delino conducted a conference call with Tobo and the hospital social worker. Both continued to voice concerns that the family still did not appear to grasp the seriousness of Justin's diagnosis, and the need for follow up care for the children. Noah had not yet seen a specialist for his anemia, despite a well child examination on August 29, 2022. Tobo in various ways to work with the family but it had been extremely challenging. Tobo obtained a Dexcom monitor, as an alternative to finger prick glucose tests, which mother agreed to in October, but while the machine is supposed to take readings every 1-5 minutes, it only had four readings at a follow up visit. Despite being repeatedly told that Type 1 diabetes is a life-long condition, mother continued to believe either Justin had been healed by weight loss, or that the hospital had misdiagnosed him. Father and paternal grandfather had diabetes training scheduled but not yet completed. No one in the family had followed through on a referral to therapy to help Justin cope with his diagnosis.

In an interim review report filed in December 2022, the Department recommended the family would benefit from reunification services, and the case was not suitable for a voluntary supervision arrangement under sections 301 or 360, subdivision (b), because mother failed to utilize or engage in previously offered services, and neither mother nor father had made any significant changes to address the hospital's prior concerns.

At the jurisdiction and disposition hearing on December 14, 2022, the parties presented arguments about the sufficiency of the evidence supporting dependency jurisdiction. The

Department argued that both parents had failed to appropriately follow up on the medical instructions regarding Justin's diabetes. Mother had missed multiple medical appointments despite efforts to follow up with her. While she participated in training, she did not grasp how to deal with Justin's diabetes and the importance of regular glucose testing and insulin. In addition, father was not sufficiently involved, had not received the necessary medical training, and had left the burden of care on mother. Also, father had no place to care for the children. The caretakers were the ones making sure the children were receiving what was needed. As to Noah, the Department noted that no follow-up had been done on his anemia, and the child remained at risk. Minor's counsel joined the Department's arguments regarding the medical neglect of Justin and Noah, emphasizing that mother's statements that Justin was cured were concerning.

Mother's counsel argued the petition should be dismissed, or in the alternative that the court should consider a plan under sections 301 or 360, subdivision (b). Counsel argued that mother denied neglecting her children's medical needs, as she obtained the required training and attended follow up appointments. Instead, while she was previously processing the medical diagnoses and trying to stay on top of appointments, she had a stronger support system now. Mother's counsel argued against removal of the children, contending the Department did not meet the standard of clear and convincing evidence.

Father's counsel also urged the court to either dismiss the counts involving his children or for a contract under sections 301 or 360, subdivision (b). Counsel argued father had not been involved previously, and so was unaware of the medical issues,

but he was more involved now, attending appointments and being there for his children's needs.

On rebuttal, the Department was not willing to do a section 301 contract, and objected to an order under section 360, subdivision (b).

After considering the Department's reports and arguments of counsel, the court noted that some of mother's statements in the reports were "just absolutely shocking to the court." Mother responded in court, "Yeah. They're atrocious. Sorry." The court found the Department had also met its burden as to father's failure to protect, stating that it was disingenuous for father to claim he would have come as soon as he knew anything, given that father had not been involved for the past fourteen years.

In considering father's request for a home of parent order, the court asked whether father had received diabetes training at the hospital. Father's counsel reported that father was in the process of enrolling, but argued that since father was now involved and had unmonitored visits, there was no risk and no concern. The court responded, "There is plenty of risk. The man doesn't know how to treat a diabetic child. You don't think that's risky? He didn't even know he had a diabetic child until this case opened."

The court sustained the first two counts of the petition, relating to medical neglect of Justin and Noah, and dismissed the counts relating to physical abuse of Justin and father's failure to provide supervision and care. It ordered the children removed from parental custody, finding by clear and convincing evidence that there was no reasonable means to protect the children without removal, and that reasonable efforts had been made to avoid removing the children. It ordered mother to attend all

13

medical appointments, to attend a specific parenting class to address Justin's medical needs, and counseling with a Department-approved therapist to address case issues. Mother would have her visits monitored by a Department-approved monitor, with the Department having discretion to liberalize visits. Father's orders were similar, but with unmonitored visits with his children. The children would have individual counseling, and conjoint with mother and father when the therapist deemed appropriate.

## DISCUSSION

### A. <u>Jurisdiction</u>

Both mother and father contend there is insufficient evidence to support jurisdiction under section 300, subdivisions (b)(1) and (j), because any risk of harm had been fully addressed by the date of the adjudication hearing. For a child to be found a dependent of the juvenile court under section 300, subdivision (b)(1), the court must find the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child. Section 300, subdivision (j), authorizes a juvenile court to assume dependency jurisdiction over a child when the following two requirements are met: "[t]he child's sibling has been abused or neglected, as defined in subdivision [(b)(1) or other subdivisions], and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." Section 300, subdivision (j) states courts should consider, when deciding

14

whether to assert jurisdiction, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child. (§ 300, subd. (j).) " '[¶] The broad language of [section 300,] subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 774.) "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Id*. at 778.)

" 'In reviewing the jurisdictional findings . . . , we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.]' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Under this standard, "we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders." (*Ibid*.)

15

"Substantial evidence must be of ponderable legal significance. It is not synonymous with 'any' evidence. [Citation.] The evidence must be reasonable in nature, credible, and of solid value. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. [Citations.]" (*Ibid*.) " '. . . "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

*Sufficient evidence to support jurisdiction*

Both parents focus their arguments on whether the evidence supported a determination that a substantial risk existed at the time of the jurisdictional hearing, implicitly conceding that a substantial risk did exist at the time the petition was filed. They both argue that by the time the adjudication took place in December 2022, any risk of harm had been eliminated because father was developing a relationship with Jacob and Justin, father and mother were communicating in a constructive manner, and all four children were being taken to their medical appointments. Mother's opening brief states: "whatever concerns existed . . . in August 2022, by the time of the December 14, 2022 jurisdiction hearing four months later, circumstances had changed significantly, to the extent that there was no substantial evidence of a current risk that mother would fail to provide Justin adequate medical treatment." Mother also points to evidence of father's increased involvement with the family, arguing that father "had stepped up and begun assuming

16

his parental responsibilities for his sons." Father similarly argues that by the time of the jurisdictional hearing, father had become involved and Justin's medical needs were being met.

"A parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133, italics omitted.) "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]' [Citation.]" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)

"A dependency court is not required to 'wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' [Citation.] Where jurisdictional allegations are based solely on risk to the child, and not on past injury, a juvenile court ordinarily determines whether a substantial risk of harm exists at the time of the jurisdiction hearing. [Citations.]" (*In re J.M.* (2019) 40 Cal.App.5th 913, 921 [reversing juvenile court's determination that dependency jurisdiction was not warranted, where parents failed to attend to child's medical needs and absconded with child to avoid removal warrant].)

In evaluating current risk, the juvenile court "should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs . . . ." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025–1026.)

The parents' failure to provide Justin with the medical and emotional support and supervision necessary to handle his

17

diabetes diagnosis posed a risk of significant harm, supporting the juvenile court's exercise of jurisdiction over Justin under section 300, subdivision (b)(1), and over his siblings under section 300, subdivision (j). As the doctor explained, a person with diabetes must monitor their glucose levels several times a day, and insulin is comparable to oxygen. Left untreated, diabetes can not only lead to a whole host of serious physical problems, but can also have detrimental psychological effects. (See, e.g., *In re M.S.* (2009) 174 Cal.App.4th 1241, 1246 [father of 14-year-old juvenile delinquent believed his son's behavioral problems were related to depression caused in part his diabetes diagnosis at age 11].)

The record before us establishes mother's repeated pattern of blaming others or denying responsibility in situations where her children needed additional support or intervention, and refusing any support that was offered. Mother repeatedly ignored or rebuffed efforts by nurses, school counselors, and the social workers to engage with her and provide assistance. Rather than enrolling the older children in counseling to help with behavioral and anger problems, mother refused services and blamed the school for racially targeting her son. Rather than responding to the school's request for supplies to help monitor his glucose levels or helping Justin to accurately monitor his levels, mother repeatedly and incorrectly insisted Justin no longer had diabetes or needed insulin because he had lost 60 pounds. Mother's ongoing refusal or inability to acknowledge her child's medical needs poses a substantial risk of significant harm. (See *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future"]; see also *In re Gabriel K.*

(2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"].)

In the Department's October 27, 2022 last minute information, which parents rely upon as part of their insufficient evidence argument, father stated he was open to a class on medically fragile children, but was still trying to enroll in a diabetes class to learn more about the disease and help more. Despite his lack of diabetes education, he stated did not believe his children had any unmet needs. While our record lacks any details about what type of training father ultimately underwent, nurse Tobo reported on December 7, 2022, that father was scheduled for follow-up training, which supports an inference that father still needed additional training before he could help Justin manage his diabetes. The evidence of improvement that mother and father rely upon does not establish that there was no significant risk of harm to Justin without the court's involvement. To the contrary, in light of father's past lack of involvement, it would be reasonable to infer that absent dependency jurisdiction and the children's detention from mother's custody, father would have continued to leave primary responsibility for the children's needs with mother.

When viewed in the light most favorable to the judgment, it is not speculative to conclude that even with an improved relationship between father and Jacob and Justin, and more consistent attendance at medical appointments, that there was still a substantial risk that Justin's medical needs would be neglected in the future, absent court intervention.

Given our conclusion that there is substantial evidence to support the petition's first count, under subdivisions (b)(1) and (j) of section 300, concerning risk to the children based on the

19

parents' medical neglect of Justin, we need not consider whether jurisdiction was warranted based on the count concerning Noah's anemia. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [when a petition alleges multiple counts and a reviewing court affirms based on one, the court need not consider the remaining counts].)

## B. <u>Removal order</u>

Section 361, subdivision (c)(1) provides for the removal of a dependent child from the physical custody of the parent "with whom the child resides at the time the petition was initiated" if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Subdivision (d) contains similar provisions with respect to removal from a parent with whom the child did not reside. (§ 361, subd. (d) [removal requires finding of substantial danger, as in subd. (c)(1), for the parent to live with the child rather than for the child to return home].) "[B]oth subdivision (c) and subdivision (d) impose the same factfinding requirements and heightened clear and convincing burden of proof for removal." (*In re S.F.* (2023) 91 Cal.App.5th 696, 720 [any error in removal order under section 361, subd. (c), rather than subd. (d) was harmless].)

" 'On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make

20

its order based on the higher standard of clear and convincing evidence.' ([*In re*] *Ashly F.* [(2014)] 225 Cal.App.4th [803,] 809; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 ['when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof'].) ' " ' The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]" [Citation.]' [Citation.]" (*In re I.R.* (2021) 61 Cal.App.5th 510, 520–521.)

Even taking into account the clear and convincing standard of proof, considering the record as a whole, the evidence discussed above is sufficient to support the court's removal order.

## C.    <u>ICWA</u>

*Relevant ICWA facts*

At the detention hearing, father denied any Indian ancestry, but maternal grandmother claimed her great-great grandmother may have Cherokee ancestry. The court directed maternal grandmother to provide the social worker with contact information for relatives that might have information, but found no reason to know ICWA applied. Paternal grandfather denied Jacob and Justin had any Indian ancestry on the paternal side of their family. The Department was in contact with other relatives, including Noah and Ryan's father and paternal great aunt, but there is no evidence those individuals were asked

whether they had reason to believe any of the children had Indian ancestry.

*Analysis*

Mother contends the Department's initial inquiry into the children's possible Indian ancestry was inadequate under section 224.2. The Department contends the issue is moot because the juvenile court made a December 13, 2023 order consistent with the relief mother seeks on appeal. In her reply brief, mother contends the December 13, 2023 order is inadequate because it orders the Department to generally investigate family members about ICWA, but does not identify specific relatives.

An appeal is moot when it is impossible for the appellate court to grant the appealing party any effective relief. (*In re D.P.* (2023) 14 Cal.5th 266, 276.) Stated differently, "the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.)

We grant the Department's motion for judicial notice. (Evid. Code, § 452, subd. (d).) The lack of specificity in the court's December 13, 2023 order directing the Department to further investigate family members regarding ICWA does not preclude the court from ensuring that the Department makes a meaningful effort to interview available relatives. Because juvenile court has already ordered the Department to take additional steps to investigate the possibility ICWA may apply, there is no effective relief we can provide on appeal, and mother's appeal of the court's ICWA determination is moot. (*In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639.) Further, in these circumstances, we decline to exercise our discretion to consider

22

the moot issue, as the continued proceedings in the juvenile court ensure that any allegedly erroneous ICWA determination in this case is not insulated from future review, and the ICWA determination is not in any way stigmatizing or prejudicial to appellants.  (See *In re D.P. supra*, 14 Cal.5th at 285-287.)

## DISPOSITION

The December 14, 2022 jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED.


MOOR, J.

We concur:


BAKER, Acting P. J.


LEE, J.*

---

**\*** Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.